DENNIS W. HARDIN and JOYCE S. HARDIN, Plaintiffs and Respondents, v. GLENN D. HILL and ROSE HILL, husband and wife, and ARTHUR D. HILL and LOTTIE HILL, husband and wife, Defendants and Appellants.

No. 11077.
Submitted November 7, 1966. Decided January 23, 1967.
Rehearing denied February 21, 1967.
423 P.2d 309.

70

J. A. Turnage (argued), Polson, John D. French, Ronan, Murphy, Robinson & Heckathorn, I. James Heckathorn (argued), Kalispell, for appellants.

Korn, Warden & Walterskirchen, Merritt N. Warden (argued), Kalispell, for respondents.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

This is an action for rescission of a contract for the sale of a ranch initiated by respondents, hereinafter referred to as Hardin. Rescission was denied, but Hardin obtained a judgment for breach of contract in the amount of $139,450.35, from which the defendants appeal.

The defendants, appellants here, are Arthur D. Hill and Lottie Hill, husband and wife, and their son Glenn D. Hill and his wife Rose Hill, and will be referred to as Hills. The Hills were joint owners of a large cattle ranch lying in Flathead and Lake counties. In 1960 the Hills listed the ranch for sale with various realtors, including Peder Pedersen. Dennis W. Hardin and his wife Joyce S. Hardin, respondents, were residents of Colorado and answered an ad for the ranch placed by Pedersen. After some correspondence between the Hardins and Pedersen, the Hardins came to Montana to inspect the ranch. On October 3, 1960, Pedersen escorted the Hardins to the Hill property to inspect it and enter further negotiations. On the following day the Hardins entered a buy and sell agreement; the final contract was signed on October 5, 1960. The purchase price of $300,000.00 included real estate, two houses, various outbuildings, equipment and machines, and some livestock.

The ranch contained both deeded land and adjacent leased or permitted land owned by four owners, the land, which the parties considered as a lease. The leases were generally for a period of one year and customarily were renewed to the owner of the deeded property. Throughout the period of negotiation, the Hills represented to the Hardins that the ranch contained approximately 5,000 acres of deeded property and 10,000 acres of leased land. The Hills also stated that approximately 11,000

acres of deeded and leased land were under fence; the area so enclosed being the "heart" of the ranch, containing the best grazing land. The Hardins realized that a survey had never been made of the ranch, and that the statements regarding acreage were rough estimates. The alleged source of the representations made by the Hills was a map prepared by the United States Soil Conservation Service which erroneously included a large portion of land within the ranch which in fact was not owned or leased by the Hills. As this map itself indicated, the boundary lines were "used for conservation planning only." Additionally, the testimony indicates that the map was not relied upon, even if seen prior to the contract.

The Hardins entered possession in January of 1961 and continued to raise cattle on the property. In September of 1963 the Hardins discovered a shortage in acreage. A survey revealed a shortage of 279 acres of deeded land and 1,456 of leased. In addition, 2,383 acres were not fenced in as represented. The Hardins attempted to renegotiate the contract and then notified the Hills of their intent to rescind the contract. This action was commenced on December 23, 1963. While rescission was not permitted by the district court, damages for breach of contract were awarded to the Hardins on a rather broad spectrum, as follows: $45,390.00 for the shortage of land within the fence. This amount was deducted from the total purchase price of $300,000.00 for purposes of recomputing the 29 percent down payment used in the contract. The difference between the actual down payment and readjusted down payment was apparently allowed as an element of damages. An additional $24,340.35 was awarded for interest actually paid and interest owing over the life of the contract on the $45,390.00 excess (computed at 4½ percent, the contract rate). The total judgment entered for the shortage of land was $77,-566.14. Additional damages were allowed for loss of anticipated profits over the life of the contract in the amount of $61,-

884.21. This figure was awarded without interest and was payable in annual installments from 1965 to 1972.

Appellants' motion for a new trial was denied; they contend on this appeal that the Hardins were not entitled to any relief and that damages awarded were excessive. There are several interesting issues presented.

Initially we must consider whether the misrepresentations made by the Hills were "fraudulent" by legal definition; and whether the failure of the Hardins to investigate the truth of those assertions would be a bar to relief. Section 13-309, R.C.M.1947, defines constructive fraud to include, "any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or anyone claiming under him, by misleading another to his prejudice * * *." We think that the district court correctly ruled that there was "fraud," but it is evident that the Hills did not intend to deceive anyone and made an honest mistake.

The Hardins relied upon the Hills' statements since they made no attempt to confirm the amount of acreage or obtain an abstract of title prior to entering the contract. We say, parenthetically that this is astonishing. According to the testimony of Mr. Hardin, a survey monument was discovered in 1963 at the southeast corner of the ranch on the fence line which indicated the true location of the boundary, and which in itself showed that the soil conservation map was in error. The contract described the deeded property by section and lot number from which the deficiency could easily have been computed.

Perhaps the most aggravating aspect of this case is the failure of the buyers to exercise a reasonable degree of circumspection before signing the contract. Certainly this is not the case of a naive or inexperienced party who is led astray by the deliberate manipulations of the seller. Mr. Hardin was an experienced real estate developer and it is clear from the record

and evidence that he had every confidence in his ability to consummate the sale to his satisfaction.

The only attorney who participated in the sale was Don Olsson, an officer of the Ronan State Bank. He drew up the contract and deed at the request of Pedersen. The bank was the escrow holder of the deed and legal services rendered by Olsson were pursuant to his affiliation with the bank. In any event, the Hardins relied upon their own judgment, based upon their own inspection, and did not seek independent legal advice before entering the agreement.

Montana decisions have held that the defense of *caveat emptor* (let the buyer beware) is available in an action based on false representations. Lee v. Stockmen's National Bank, 63 Mont. 262, 207 P. 623; Helena Adjustment Co. v. Claflin, 75 Mont. 317, 243 P. 1063. However, these cases apply the rule where the purchaser had actual notice of the true state of affairs prior to entering the contract for sale. Under the facts of this case it is at least arguable that the Hardins knew that the Hills did not have substantial factual support for the statements made concerning the amount of acreage. To allow a defense of *caveat emptor* on this basis involves a degree of conjecture which this court should not entertain, and we do not feel it is necessary to a proper resolution of this dispute to formally rule on the matter of *caveat emptor*. But the relative conduct of the parties in a suit for equitable relief cannot be overlooked. The Hardins at least co-authored the defective transaction before us and should not be heard to deny all responsibility for the consequences.

The Hills urge that this was a sale in gross, as distinct from a sale by the acre, and since the Hardins purchased the ranch as a single unit they would not be entitled to any relief. The evidence clearly shows that the ranch was sold as a single going concern; there was no discussion or agreement on a per acre price. Moreover, the contract described the deeded land by section and lot number and did not indicate the number of

deeded acres. The lease land was described as "approximately Ten Thousand (10,000) acres." Taking the language of the contract together with the express intent of the parties to bar- gain for the ranch as a whole, we feel that the sale was clearly one in gross.

▪ Generally when land is sold in gross, a variation in acre- age from what the parties had contemplated is not grounds for rescission or other relief. Faure v. Martin, 7 N.Y. 210. But this proposition does not apply to a sale in gross induced by ma- terial misrepresentations. (55 Am.Jur., Vendor and Purchaser, § 129, p. 604). We therefore hold that the Hardins are entitled to some relief.

It is difficult to understand why the district court refused to grant rescission, yet awarded such extensive damages, even more than under rescission. It is true that the court below was in a better position to determine whether it would be possible to restore the parties to the positions they occupied prior to the contract. We do feel that damages awarded to the Hardins are excessive and cannot be allowed to stand as a final judg- ment.

Damages given fall into two categories: for shortage of acre- age and for loss of anticipated profits. It is this second element with which we are most concerned.

Section 17-301, R.C.M.1947, provides: "For the breach of an obligation arising from contract, the measure of damages, ex- cept where otherwise expressly provided by this code, is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the or- dinary course of things, would be likely to result therefrom." Montana decisions construing this section have consistently followed the test first established in the 1854 English case of Hadley v. Baxendale, 156 Eng.Rep. 145; damages proximately caused by breach of contract are those which were within the reasonable contemplation of the parties at the time the contract was entered. Healy v. Ginoff, 69 Mont. 116, 220 P. 539; Myers

v. Bender, 46 Mont. 497, 129 P. 330; Smith v. Fergus County, 98 Mont. 377, 39 P.2d 193. Although this ranch was not purchased on a "cow-unit" or animal unit basis, representations made by the Hills with respect to the number of cows which the ranch would support are relevant in considering what the parties expected and contemplated. The amount of land which was fenced in also relates directly to the question of anticipated profits.

The direct testimony of Mr. Hardin clearly indicates how many head he could reasonably expect to run.

Mr. Warden: "And I believe the testimony before at the hearing last September was that they [the Hills] told you they were running about 200 head or a few more and that another hundred could be raised without doing anything, improving any of the stuff within the fence?"

Mr. Hardin: "That's correct."

Mr. Warden: "Now, did this business of how many cattle the ranch would raise have anything to do with your final decision and the payment schedule of the contract?"

Mr. Hardin: "Yes."

Mr. Warden: "In what way?"

Mr. Hardin: "The payment schedule on it or terms of pay on the contract, they reflect the income off of the cattle that the ranch would run."

The Hills said that the ranch would carry about 300 to 325 head without further improvements. The district court found that as a matter of fact the ranch would support 500 head. We must conclude from this evidence that the property would support a substantially greater number of cattle than the Hills represented. It is significant also that the Hardins were not experienced in the ranching business; there is no indication that the Hardins made an independent assessment of the carrying capacity of the ranch prior to entering the contract. We are now dealing with what was within the reasonable expectation of the parties at the time of contracting. Applying

this standard it is clear that the Hardins were not damaged for loss of profits by the shortage in acres. Now, it is possible that had there been 1,100 more acres under fence, an additional 100 head per year could have been run. But to allow damages on this basis ignores the correct legal standard.

The Hardins had up to 800 head on the ranch. There is evidence that cattle placed outside the fence strayed back inside because the fences were not in good repair. It appears that some cattle belonging to neighboring ranchers also wandered inside the fenced area. Perhaps this is why Mr. Hardin claimed that the ranch would not support even 225 head. We doubt that a pasture so over-taxed could support *any* cattle. That evidence indicates that poor ranch management could have been the reason that expected profits failed to materialize. We feel that there is no evidence to support a judgment for damages based on loss of profits reasonably anticipated by the parties, and hold that such damages should be disallowed as a matter of law.

The Hardins should be entitled to the contract value of the missing acreage.

The district court assigned a value of $20.00 per acre to land missing from within the fence and $3.50 per acre for land outside. The amount of land fenced in presents an improper or misleading issue. What is actually involved is not whether the land is fenced but the quality of the land so enclosed and the number of cattle it will support. The testimony throughout indicates that the real concern of the Hardins was the occurrence of good grazing land within the fence. As the Hills correctly pointed out, it would be a relatively simple matter to fence off more acreage, if this in fact was the crux of the matter. The Hardins said that this would be of no avail, since land not already within the fence was not good open pasture, being hilly and partially forested. This court has held that representations as to the quality of land and the ability of the land to produce profits sufficient to meet contract pay-

ments are expressions of opinion or judgment only, and will not per se constitute actionable fraud. Ott v. Pace, 43 Mont. 82, 92, 115 P. 37. As we have pointed out, there is no evidence that the Hills made any misrepresentations as to the productivity of the ranch. The Hills may have incorrectly expressed their opinion as to the amount of prime grazing acreage, but standing alone this is insufficient grounds for relief. No distinction should be drawn, therefore, between land under fence and that beyond the fence for purposes of computing damages.

Whether the leased property is worth as much as the deeded land is basically a fact question. This court has recognized that leased property contiguous to a ranch is valuable to a rancher. Ivins v. Hardy, 134 Mont. 445, 462, 333 P.2d 471, 334 P.2d 721. In computing damages, the district court valued the two types of land equally, and we feel that there is sufficient evidence to support this finding. The Hills certainly considered the leased land to be of equal value as did other ranchers testifying on this question.

■■ Damages allowable for the missing acreage should be computed from the contract value on a per acre basis, without distinction between deeded and leased land and whether fenced or open. The Hardins testified that they attributed about $210,000 of the total purchase price to the real estate alone, exclusive of buildings, equipment and livestock. Although the Hills placed a somewhat greater value on the improvements, the figure of $210,000 seems fair and reasonable. The value per acre of 15,000 acres calculated at the contract rate would be $14.00. Since the total shortage was 1,735, damages allowable should be $24,290 (which is 1,735 multiplied by $14).

It is of interest to note that the offer of settlement proposed by the Hardins prior to bringing this action was termed "unconscionable" by the trial judge, yet the damages awarded below appear to us equally harsh and excessive. A new trial should be granted unless the respondents agree to accept $24,-290 plus interest in damages. In the event a new trial is had,

78

we feel that the possibility of allowing rescission should be considered.

The cause is remanded to the district court, with directions to grant a new trial in accordance with this opinion, unless within sixty days after the remittitur is filed with the clerk of that court, the respondents shall file their written consent that the judgment may be reduced to $24,290 plus interest at the rate of 6 percent from the date of the contract.

We have not hereinbefore alluded to the contract terms. Contract payments are, and have been, in default since December 15, 1963. In order that proper credit on contract payments be achieved, the district court shall hold a hearing to determine the present contract status, both as to payment and interest schedule. Because of our holding that "fraud," albeit constructive fraud, was had by Hills, and our finding that the Hardins "co-authored" the defective transaction, we do not allow interest to run on the contract payment schedule, during the pendency of this litigation.

If the above consent is given, and after such hearing as the district court may hold to achieve the contract schedule as above, the judgment will be and is affirmed as modified, each party to pay their own costs.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES ADAIR, DOYLE and JOHN C. HARRISON, concur.