Gary K. ASLESON and Mary M. Asleson, his wife, and the Asleson Company, a North Dakota Corporation, Plaintiffs and Appellees,

v.

WEST BRANCH LAND CO., a North Dakota Corporation, and Century 21AAA Valley Park Real Estate, Inc., a North Dakota Corporation, Defendants and Appellants.

Civ. No. 9958.

Supreme Court of North Dakota.

Oct. 23, 1981.

Mack, Moosbrugger, Ohlsen & Dvorak, Grand Forks, for defendants and appellants; argued by Shirley A. Dvorak, Grand Forks.

Longmire & Unruh, Grand Forks, for plaintiffs and appellees; argued by George Longmire, Grand Forks.

PAULSON, Justice.

This is an appeal from a judgment of the District Court of Grand Forks County, sitting without a jury, in favor of Gary K. Asleson and Mary M. Asleson, his wife, and The Asleson Company, a North Dakota corporation, plaintiffs-appellees. The judgment awarded the plaintiffs $7,335 from defendants-appellants, West Branch Land Company [West Branch] and Century 21AAA Valley Park Real Estate, Inc. [Valley Park], both North Dakota corporations. The plaintiffs' claim for damages arose from their purchase of a tract of unimproved land for construction of multi-housing units. The land was sold to the plaintiffs by the defendant, West Branch, through its realtor, Valley Park. The property was listed in a listing by the Multiple Listing Service [MLS] of Grand Forks to be zoned for 35 units when, in fact, it was zoned for 30 units. The plaintiffs' claim for damages was based upon false representation and constructive fraud which resulted in damage to the plaintiffs. The judgment is modified and, as modified, affirmed.

The dispute centers around the sale of a piece of property described specifically as:

Lot Eighteen (18), Block One (1), Kuster's Addition to the City of Grand Forks, County of Grand Forks, State of North Dakota

Defendant West Branch was the fee owner. West Branch listed the property for sale with Valley Park, which was owned and operated by William W. Putnam. Putnam was also at the time the president of West Branch, but he owned no stock in it. Valley Park is a member of the MLS in Grand Forks.

The plaintiff, The Asleson Company, was also a member of the MLS in Grand Forks. Plaintiff, Gary K. Asleson, president of The Asleson Company, is a licensed real estate broker. The Asleson corporation primarily engages in building construction and land development. It does not engage in real estate sales but uses its real estate broker's license primarily for selling the houses it constructs.

When West Branch listed the property for sale through Valley Park, Mr. Putnam prepared a listing for the lot which was published in the MLS listing sheet which advertised the property and which was distributed to all the real estate agency subscribers of the MLS in Grand Forks. The MLS listing sheet advertised the property as "zoned multi for 35 townhouses". In fact, the property consisted of 3.04 acres and was zoned for 10 units per acre, rendering the property suitable for 30 units.

The error in the listing arose from the following sequence of events. The property was zoned for a density of 10 units per acre. Prior to preparing the listing for the property, Putnam called the firm of Richmond Engineering, which had been hired by West Branch to do the surveying and engineering of the Kuster Addition. He spoke to a "Gary", an employee of Richmond, and asked how much land there was in Lot 18, and Gary responded that there was approximately three and a half acres. On that information Putnam listed the lot as zoned for 35 townhouses.

It was not until the final plan was drawn up by Richmond Engineering that the true acreage available was known. The final plat map and the zoning ordinance affecting Lot 18 became effective on June 20, 1977, and the plat map would have been available at the city planner's office in Grand Forks since that time. The final plat map indicated that Lot 18 consisted of 3.04

acres and was zoned for 10 units per acre. Mr. Putnam stated that he did not update the listing after the final plan was approved effective June 20, 1977.

In June of 1977, Asleson received a copy of the listing of the property in question owned by West Branch. Upon receipt of the listing, Asleson prepared an offer computing it on a cost-per-unit basis for 35 units. The amount of this first offer was $52,500. Valley Park countered with an alternative offer of $65,000, which Asleson accepted. On August 30, 1977, The Asleson Company entered into an earnest money contract to purchase the property for $65,-000 from West Branch. The earnest money contract made no mention of the acreage or zoning status of the lot. The deed signed on August 18, 1978, listed West Branch as the grantor and Gary K. Asleson and Mary M. Asleson as grantees. The Asleson Company, however, was to pay for the property.

The commission for the sale of the property was split between Valley Park, as the listing agent, and The Asleson Company, as the selling agent, each party receiving a check for $1,950. Asleson contends that the check for $1,950 was a discount on the purchase price which is normally given to real estate agents when they buy property from another real estate agent. Defendants, on the other hand, argue that the check was strictly for the purpose of a commission.

Mr. Asleson first became aware of the error in the listing in April, 1979. He had some plans for townhouses that he was going to put on the property and his draftsman had a difficult time getting the number of units on the property. Asleson then contacted the Grand Forks city planner's office and was informed that the property was zoned for 30 units, and not 35 units. On the same day he telephoned Mr. John Moosbrugger, the secretary of West Branch, in order to notify him of the error and to seek an adjustment in the price of the property. He also wrote Moosbrugger a letter regarding this matter, but Moosbrugger did not respond to Asleson's letter following the telephone call to him.

There being no response to his communications, Mr. Asleson sought the help of an attorney, Mr. George M. Unruh, who also wrote a letter to Mr. Moosbrugger, as well as attempted to reach him by telephone. Mr. Moosbrugger did not return any of his phone calls or respond to Mr. Unruh's letter. Hence, the initiation of this lawsuit.

The defendants, West Branch and Valley Park, were originally served with a summons and complaint by Gary K. Asleson and Mary M. Asleson and The Asleson Company, alleging actual fraud in the sale of the property. The defendants answered and counterclaimed and served a third-party summons and complaint on Century 21 TAC Real Estate Corporation, as a successor in interest to The Asleson Company. Prior to the hearing, plaintiffs moved to amend their complaint from actual fraud to constructive fraud.

On January 17, 1980, the trial judge issued a memorandum decision granting the Aslesons' motion to amend the complaint, denying both the plaintiffs' and defendants' motions for summary judgment, and granting Century 21 TAC Real Estate Corporation's (third-party defendant's) motion to dismiss the third-party complaint against it.

The defendants in the main action, West Branch and Valley Park, third-party plaintiffs, alleged that Century 21 TAC Real Estate Corp. was a necessary party to the action because it is a successor in interest to The Asleson Company. The third-party plaintiffs alleged that the selling agent at the time the property was sold was The Asleson Company and its successor in interest is now Century 21 TAC Real Estate Corp. Third-party plaintiffs maintained that under the laws of the Multiple Listing Service and the laws of agency, the third-party defendant, Century 21 TAC Real Estate Corporation, acted as the agent of the defendant, Valley Park and thus had a duty to inquire as to zoning regulations, lot size, and other pertinent matters pertaining to the sale of said property. Third-party plaintiffs alleged that this duty was breached by Century 21 TAC Real Estate Corp. and damages resulted. Therefore, they

sought relief of contribution or indemnity for any and all sums which may be adjudged against them for actions of the third-party defendants.

The trial judge dismissed the third-party defendant and ordered West Branch and Valley Park to make any claims they had for indemnification to be made by way of a counterclaim against The Asleson Company. The defendants thereupon counterclaimed against Gary Asleson and The Asleson Company for indemnification and that counterclaim was subsequently dismissed by the trial court.

The case was tried without a jury and concluded on June 19, 1980.[1] The trial judge concluded, among other things, that the defendants made, expressly and verbally, a material misstatement of fact and that the plaintiffs relied on it and that the defendants' acts amounted to constructive fraud.

The trial judge concluded that the plaintiffs were damaged under the benefit of the bargain rule and computed damages as follows, stating, at the close of the trial:

> "For the damages, I have noted the prayer for relief in the plaintiff's amended complaint which is also summarized . . . [in] his Brief. By multiplying out 35 times 1857.14, I come up with a total of $64,995 for 35 units; and, if you multiply 30 times 1857.14, you come up with 55,714 and if you subtract that from 64,995, the result is 9,281, and if the commission of 1,950 is subtracted from 9,281, the result is $7,335."

Defendants, West Branch and Valley Park, essentially attack as error the trial court's findings of fact and conclusions that both corporations were liable under a theory of constructive fraud. They further attack the trial court's damages award and they appeal from the dismissal of its counterclaim for indemnification.

1. The dates of the trial were: June. 17, 1980, August 13, 1980, and December 4, 1980.

2. *California Civil Code § 1573. "Constructive fraud*

Initially, we must consider whether the misrepresentations made by the defendant, Valley Park, amounted to constructive fraud under § 9–03–09, N.D.C.C.; and whether or not the failure of Asleson to investigate the truth of those assertions would be a bar to relief.

In North Dakota, fraud is either "actual or constructive." § 9–03–07, N.D.C.C. "Constructive fraud" is defined by § 9–03–09, N.D.C.C., as follows:

> "Constructive fraud consists:
>
> 1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under him, by misleading another to his prejudice or to the prejudice of anyone claiming under him; or
>
> 2. In any such act or omission as the law specially declares to be fraudulent without respect to actual fraud."

Subsection 1 of § 9–03–09 is the portion relevant to this case and the focus of our inquiry.

■ To sustain a judgment based on constructive fraud in this case there must be a breach of a duty owed to The Asleson Company by the defendants which gains an advantage to the defendants. This breach of duty must also be found to have misled The Asleson Company to its prejudice or anyone claiming under it.

In this case the relationship between the parties is one of real estate brokers who are both members of the Multiple Listing Service of Grand Forks as well as vendor and purchaser of real property.

North Dakota has little case law dealing with constructive fraud, most of our cases being questions of actual fraud. Therefore, our discussion must look to other States for guidance. We look especially to California because our constructive fraud statute, § 9–03–09, N.D.C.C., is derived from California Civil Code § 1573.[2]

CONSTRUCTIVE FRAUD. Constructive fraud consists:
1. In any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault, or any one claiming

One of the few North Dakota cases involving constructive fraud is *Fire Association of Philadelphia v. Vantine Paint and Glass Co.*, 133 N.W.2d 426, 431–432 (N.D. 1965), in which the court quoted from 23 Am.Jur. Fraud and Deceit § 4 at pages 756–757 as follows:

" 'Constructive fraud, sometimes called legal fraud, is nevertheless fraud, although it rests upon presumption and rests less upon furtive intent than does moral fraud. It is presumed from the relation of the parties to a transaction or from the circumstances under which it takes place. * * * Hence, the terms "constructive fraud" and "legal fraud" both connote that in certain circumstances, one may be charged with the consequences of his words and acts, as though he has spoken or acted fraudulently, although, properly speaking, his conduct does not merit this opprobrium.'

\* \* \* \* \* \*

" '* * * the term "legal" fraud * * * is generally used to characterize a misrepresentation made without knowledge of its falsity.' "

The Court in *Vantine Paint, supra,* however decided for the defendant on the basis of there being no showing of reliance by the plaintiff.

We find in 37 Am.Jur.2d, Fraud and Deceit § 220, page 293, that:

"The reason generally given for the equitable rule as to innocent but false representations is that courts of equity may grant relief on the ground of constructive fraud such as would not authorize relief by way of an action of deceit at law."

We first discuss whether or not there was a breach of duty owed to The Asleson Company by the defendants. This question is compounded by the fact that both parties, Asleson and Valley Park, in the person of William Putnam, were licensed real estate brokers at the time of this transaction and were both members of the Multiple Listing Service.

The Multiple Listing Service is a corporation whose members, by way of a daily listing sheet, exchange information on real estate they have for sale. A realtor who lists the property for sale, called the listing agent, gets information from the owner-vendor of the property and gathers information on his own and puts that information on a form which is reproduced on the daily listing by the Multiple Listing Service. The daily listing contains all of the listings by all of the members of the Multiple Listing Service. Any member agent is entitled to sell any of the properties listed, unless it is some type of exclusive listing. A realtor seeking to sell property listed by another is called a selling agent. When a selling agent secures a purchaser for listed property, the MLS franchise agreement provides that the listing agent and the selling agent are to split the commission on the sale.

■■■■ The nature and purpose of a Multiple Listing Service make it incumbent upon those who list property to do so accurately and to inform users of any errors in a listing. This is necessary so that members of the Service can confidently solicit purchasers without worrying about misrepresenting the property they wish to sell. It was brought out in testimony at trial that a listing agent has a duty to correctly list property and to make known any errors in the listing to those who are dealing with the property. Therefore, as the listing agent, Valley Park had a duty to make known the error in the zoning status of the property in question to anyone interested in the property and to correct the listing. However, Mr. Putnam testified that even after the final plat which indicated the true zoning status of the property was filed at City Hall he did not correct the listing despite the fact that negotiations for the property had commenced.

Nevertheless, the defendants would have us impose a corresponding duty on Asleson

under him, by misleading another to his prejudice, or to the prejudice of any one claiming under him; or,

2. In any such act or omission as the law specially declares to be fraudulent, without respect to actual fraud. (Enacted 1872)."

to discover the error in the listing on the basis of a subagency between Asleson as a selling agent and Valley Park as the listing agent. Case law has held that the listing agent is an agent of the owner of the property to be sold and that the selling agent is also a subagent of the listing agent for purposes of finding a purchaser. This arrangement has resulted in a holding that a listing agent and selling agent are jointly and severally liable for damages to a third-party purchaser. *First Church of The Open Bible v. Cline J. Dunton Realty, Inc.*, 19 Wash.App. 275, 574 P.2d 1211 (1978).

■ The defendants in the present case seek to apply this reasoning here to assert a joint and several liability on Asleson as a selling agent. We do not believe, however, that the above reasoning is applicable to the present case. We agree with the trial court that this is not a typical listing agent—selling agent transaction. The Asleson Company purchased the property for itself using Gary Asleson, its president, who has a broker's license, as a tool for completing the sale. Asleson did not solicit or find the purchaser. Therefore, we will not assert joint and several liability on Asleson on the basis of a breach of a duty on his part as a subagent of Valley Park to discover the mistake in the listing which was made by Valley Park.

■ We believe that Asleson's status as a broker, in itself, does not impose on him a duty to discover the listing mistake by Valley Park. A holding to that effect would merely allow a listing agent to incorrectly list property and place the responsibility on a broker-purchaser. This does not mean, however, that Asleson's status as a broker is of no consequence at all to this case. We will discuss his broker's status in the context of the reasonableness of his reliance on the listing sheet.

In the Washington case of *First Church of The Open Bible v. Cline J. Dunton Realty, Inc., supra,* which discussed the subagency relationship between selling and listing agents, the court also pointed out that a listing broker is liable in damages or rescission to the purchaser for misrepresenting property for sale, even though he acted under an honest mistake without any intent to deceive.

■ The duty, a breach of which supports an action for constructive fraud, is generally a result of the relationship between the parties. In 37 C.J.S. Fraud § 2, page 213, it is stated:

"Constructive fraud is most frequently found in a breach of duty arising out of a fiduciary or a confidential relationship; but the authorities are not entirely harmonious as to when, for this purpose, a fiduciary or confidential relation exists, and the rules laid down for determining the question are not definite.

"Constructive fraud usually arises from a breach of duty where a relationship of trust and confidence exists. While the doctrine of constructive fraud is not in great favor with the courts, it is recognized where a fiduciary relationship exists between the parties, and, indeed, is said to arise from the very conception and existence of such a relation.

\*　　\*　　\*　　\*　　\*　　\*

"... nevertheless, to establish a fiduciary relationship, on a violation of which fraud is sought to be based, there must be something approximating business agency, professional relationship, or family tie impelling or inducing the trusting party to relax the care and vigilance he would ordinarily exercise."

Other jurisdictions have supported and adopted the view that constructive fraud of necessity involves a breach of duty or other fiduciary or confidential relationship. *See, Stout v. Vesely,* 228 Iowa 155, 290 N.W. 116 (1940); *Vogt v. Town and Country Realty of Lincoln,* 194 Neb. 308, 231 N.W.2d 496 (1975); *Norlander v. Cronk,* 300 Minn. 471, 221 N.W.2d 108 (1974); *Maine v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 67 Cal.App.3d 19, 136 Cal.Rptr. 378 (1977); *Mesmer v. White,* 121 Cal.App.2d 665, 264 P.2d 60 (1954).

■ One's implicit faith in another's honesty and integrity is insufficient to establish

a fiduciary relationship, as regarding constructive fraud. *Fowler v. Associated Oil Co.*, 74 P.2d 727 (Cal.1938); *Pearce v. Associated Oil Co.*, 74 P.2d 736 (Cal.1938). Gary Asleson testified that he had known Putnam for several years and knew him to be a reliable realtor. He said he had confidence in him and there was nothing that would cause him to doubt the listing. Asleson's faith in Putnam, however, is not sufficient to establish a confidential or fiduciary relationship for purposes of constructive fraud.

This is a case involving a sale of land, however, and there are special duties governing land sales which have established constructive fraud in the absence of a fiduciary or confidential relationship. In California, it is a vendor's duty to inform himself correctly regarding the boundaries of the land he seeks to sell. *DeBairos v. Barlin*, 46 Cal.App. 665, 190 P. 188 (1920). In *Stone v. Farnell*, 239 F.2d 750 (9th Cir. 1956), the court, citing *DeBairos, supra*, stated that, under California law, vendors of realty who breached their duty of informing themselves of the true boundaries of the realty sold committed constructive fraud. It is further stated in *Stone v. Farnell, supra*, 239 F.2d at 756, that a purchaser is entitled to rely on a vendor's representations as to acreage or footage. It has been held by the Supreme Court of Wisconsin that licensed real estate brokers and their agents have a special duty not to mislead or deceive purchasers. *Lien v. Pitts*, 46 Wis.2d 35, 174 N.W.2d 462 (1970). The reasoning behind the California rule is that the acreage of land cannot be seen by the eye at a glance, but can only be ascertained by scientific measurement. *Stone v. Farnell, supra.*

The Supreme Court of Iowa has recently followed this reasoning in *Holcomb v. Hoffschneider*, 297 N.W.2d 210, 212 (Iowa 1980), wherein it stated:

"... a buyer cannot generally be held to be able to judge the contents of a parcel of land by the eye. *Boddy v. Henry*, 126 Iowa 31, 42, 101 N.W. 447, 451 (1904). Even though a buyer examines land before purchasing, he may normally rely upon the representations of the seller as to measurement."

We believe that the above rationale can be applied to the facts of the present case. The listing sheet which Asleson relied upon contained a copy of a plat map which included Lot 18. Nothing in the record suggests that the map did not accurately set out the boundaries of Lot 18. The listing was also silent as to the acreage or square footage of the lot. Other than the plat of Kuster Addition, the only representations made by the listing were as follows:

"REAL TAX UNKNOWN AT TIME

SPECIALS HAVE NOT BEEN SPREAD AS YET

LOT 1 BLOCK 1 SOLD TO CHURCH

LOT 18 BLK 1 IS ZONED MULTI FOR 35 TOWNHOUSES

LISTED BY VALLEY PARK

6–22–77 to

6–22–78

C–6–50/50"

On the back of the listing were designated the lots in the Kuster Addition and the prices at which they were sold. However, for Lot 18, Block 1 the listing described it as "multi". Nevertheless, before listing the property as zoned for 35 townhouses, it was incumbent upon the defendants to inform themselves of the area of the property in order to determine its actual zoning status. In effect, the representation of the zoning to be adequate for 35 townhouses is a representation of the size of Lot 18. There is nothing on the listing or in the record which indicates that Asleson was placed on notice that the zoning of the property was not correctly stated on the listing sheet.

The defendants' brief focuses primarily on the argument that it was unreasonable and unjustifiable for Asleson, as a real estate broker, to rely only on the information contained on the listing sheet without further investigation. The defendants point out that a final plat map indicating that the property contained 3.04 acres and was zoned for 10 units per acre was available at the city planner's office starting June 20, 1977. The sale was consummated in Au-

gust, 1977. They also point out that Asleson could have discovered the correct zoning status of the property by just making a phone call to the city planner's office. The defendants assert that Asleson is a real estate broker and, as such, he would be subject to a higher standard of care in the transaction than the reasonable man standard.

Defendants point to *Berg v. Xerxes Southdale Office Bldg. Co.*, Minn., 290 N.W.2d 612 (1980), to support their argument that because Asleson was a broker he was not justified on relying on the listing sheet without further investigation. In *Berg, supra*, an attorney who was the plaintiff sued a limited partnership for misrepresentations on a *pro forma* statement. The Minnesota Supreme Court in *Berg, supra* 290 N.W.2d at 616, stated:

"... the question to be asked when determining reasonable reliance is 'not whether the representation would deceive the average man * * * [but rather] whether the representations were * * * calculated to deceive, not the average man, but a person of the capacity and experience of the particular individual' who received the representations, *Spiess v. Brandt*, 230 Minn. [246] at 254, 41 N.W.2d [561] at 567; 8A Dunnell Minn. Digest 2d, *Fraud*, § 2.04 (3d ed. 1979), ..."

The court in *Berg* also pointed out at page 616 that the reasonableness of reliance by the attorney was a fact issue. The trial court in the instant case decided this fact in favor of Asleson. After reviewing the record, we cannot say that this was clearly erroneous since there was testimony that multiple listings are deemed reliable although they are not guaranteed. There was also testimony to the effect that a listing agent is supposed to keep up with any changes regarding his listed property and inform the MLS and prospective purchasers as to those changes.

In further support of their contention that Asleson's reliance on the listing sheet without further investigation was unreasonable, defendants cite *Marshall v. Keave-*

*ny*, 38 N.C.App. 644, 248 S.E.2d 750 (1978) wherein a district court issued a summary judgment in favor of the defendant realtors and sellers in a case where the buyer had alleged fraudulent misrepresentations as to the number of heated square feet in a house that he purchased. The North Carolina Court of Appeals held that the trial court correctly determined as a matter of law that the plaintiff could not reasonably rely on the alleged prior representations as to the heated square footage and that the granting of a summary judgment to the defendant was not error. The North Carolina Court of Appeals stated in *Marshall, supra* 248 S.E.2d at 754:

"We are well aware that the point at which reliance ceases to be reasonable and becomes such negligence and inattention that it will, as a matter of law, bar recovery is difficult to determine and, in close cases, should be resolved in favor of the party alleging reasonable reliance upon fraudulent misrepresentations. *Johnson v. Owens*, 263 N.C. 754, 140 S.E.2d 311 (1965). Nevertheless, 'The right to rely on representations is inseparably connected with the correlative problem of the duty of a representee to use diligence in respect of representations made to him.' *Calloway v. Wyatt*, 246 N.C. 129, 134, 97 S.E.2d 881, 886 (1957). If the party seeking to bring an action for fraud based upon misrepresentations of a seller has not reasonably relied upon those representations, he has no claim upon which relief can be granted. *Cofield v. Griffin*, 238 N.C. 377, 78 S.E.2d 131 (1953)."

In *Marshall v. Keaveny, supra*, the court recognized that the plaintiff did not rely on the misrepresentations of the square footage of the house to such an extent as to forego making his own investigation of the house. Because the plaintiff did investigate the house, the court said that he was also assumed to have the skills necessry to make any measurements that he deemed material. In essence, what the court said was if the square footage of the house was material to the plaintiff then he should

have measured it when he investigated the interior of the house. *Marshall v. Keaveny, supra,* is an example of a situation where the court finds that an investigation of the subject matter of a transaction indicates a plaintiff's nonreliance on a misrepresentation. After walking through the house, the plaintiff engaged in further arm's-length bargaining with the defendants resulting in his offering and their accepting a purchase price below the listed price.

*Marshall v. Keaveny, supra,* is an example of the earlier attitude of courts in cases involving justifiable reliance. Prosser, Torts 4th Ed. (1971) at page 717 explains that earlier cases dealing with issues of justifiable reliance were under the influence of the doctrine of *caveat emptor* and emphasized a plaintiff's duty to protect himself. These cases required the plaintiff to make a reasonable investigation. Prosser states, at page 717:

> "The recognition of a new standard of business ethics, demanding that statements of fact be at least honestly and carefully made, and in many cases that they be warranted to be true, has led to an almost complete shift in this point of view."

Prosser at pages 717–718 further explains that assertions of fact as to the quantity or quality of land sold inducing commercial transactions may be justifiably relied upon without investigation not only where investigation would be difficult but also where the falsity of the representation can be easily discovered. The example given is that a plaintiff is not required to examine public records to ascertain the true state of the title as claimed by a defendant. A plaintiff is only required to make an investigation when the facts should be apparent to a person of the plaintiff's knowledge and intelligence from a cursory glance, or when there is something that serves as a warning he is being deceived. Prosser, Torts 4th Ed. 718.

In accordance with the trend pointed out by Prosser and in contrast to *Marshall v. Keaveny, supra,* is *Barnes v. Lopez,* 25 Ariz. App. 477, 544 P.2d 694 (1976) which was a case involving misrepresentation where a parcel of property was represented as being zoned entirely commercial when, in fact, it was only zoned commercial in part. The court determined that the representation as to the property's zoning was a misrepresentation as to an existing fact and stated that the plaintiff was entitled to rely on the representation despite the fact that the plaintiff could have, by proper inquiry, discovered the correct zoning status. The court said that where a positive, distinct, and definite representation as to the zoning status of the property was made, the plaintiff was entitled to rely on it with no further duty to make further inquiry, even though the facts could be ascertained by an inspection of public records. *Barnes, supra,* 544 P.2d at 697. Other cases holding that in cases of fraud there is no duty on the part of the defrauded party to investigate public records to ascertain the truth include *Kannavos v. Annino,* 356 Mass. 42, 247 N.E.2d 708 (1969) and *Cousineau v. Walker,* 613 P.2d 608 (Alaska 1980).

*Kannavos v. Annino, supra,* involved fraudulent misrepresentations and concealment of material facts in the sale of a house. The court in *Kannavos* stated that failure of the purchasers to check public records, which would have disclosed that the use of the house they had purchased as a multi-family dwelling violated a city zoning ordinance, did not preclude the purchasers from obtaining rescission on the ground of fraudulent representations by the vendors that the house could be used by the purchasers as a multi-family dwelling.

In *Cousineau v. Walker, supra,* an action was brought by purchasers seeking rescission of a land sale contract because of alleged false statements by the vendors. The Supreme Court of Alaska held in *Cousineau,* that a purchaser of land may rely on material representations made by a seller and is not obligated to ascertain whether or not they are true; and although the purchaser's actions may have exhibited poor judgment for an experienced businessman, such actions were not so unreasonable or preposterous in view of the vendor's description of

the property that recovery should be denied.

*Cousineau v. Walker, supra,* contains an instructive discussion on reliance on false statements, materiality of statements, and justifiable reliance and is particularly pertinent to the instant case since the plaintiff, Cousineau, was recognized by the court to be an experienced businessman who frequently bought and sold real estate and was knowledgeable in real estate matters. In reversing the lower court's denial of the Cousineaus' claim for rescission of a land sale contract the Supreme Court of Alaska stated in *Cousineau, supra* 613 P.2d at 616:

"We conclude that a purchaser of land may rely on material representations made by the seller and is not obligated to ascertain whether such representations are truthful.

"A buyer of land, relying on an innocent misrepresentation, is barred from recovery only if the buyer's acts in failing to discover defects were wholly irrational, preposterous, or in bad faith."

We believe that the above conclusion and the rationale behind it are applicable to the present case and that the district court in the instant case correctly ruled that there was constructive fraud despite the fact that the appellants did not intend to deceive anyone.

Asleson, even though he was an experienced, licensed real estate broker, made no attempt to confirm the lot's zoning status and relied on the MLS listing of the property without further investigation. The computation sheet he used to compute his offer on the property indicated that he did not know the net building area of the lot.

The instant case is similar to the case of *Hardin v. Hill,* 149 Mont. 68, 423 P.2d 309 (1967), which dealt with constructive fraud in the sale of a ranch. The Montana Supreme Court upheld the finding of constructive fraud even though the plaintiff was an experienced real estate developer and there was no intent to deceive, but, rather, there was an honest mistake on the part of the defendant-seller. In upholding the trial court's determination of constructive fraud

in the instant case, we are of the same mind as the Montana Supreme Court when it stated in *Hardin, supra,* 423 P.2d at 311:

"Perhaps the most aggravating aspect of this case is the failure of the buyers to exercise a reasonable degree of circumspection before signing the contract. Certainly this is not the case of a naive or inexperienced party who is led astray by the deliberate manipulations of the seller. Mr. Hardin was an experienced real estate developer and it is clear from the record and evidence that he had every confidence in his ability to consummate the sale to his satisfaction."

## DAMAGES

North Dakota has not specifically stated what the rule is for damages for constructive fraud. Asleson would have us apply the benefit of the bargain rule and points to early North Dakota cases which have applied that rule to cases involving actual fraud. *See, Fargo Gas & Coke Co. v. Fargo Gas & Electric Company,* 4 N.D. 219, 59 N.W. 1066, 1069 (1894); *Gunderson v. Havanna-Clyde Mining Co.,* 22 N.D. 329, 133 N.W. 554 (1911); *Warne v. Finseth,* 50 N.D. 347, 195 N.W. 573 (1923). Defendants, on the other hand, would have us apply the out-of-pocket rule. The benefit of the bargain rule of damages gives the damaged party the equivalent of what he would have received if the representations he relied upon had been true. The out-of-pocket measure of damages is the difference in value between what has been given as consideration and the value of what has been received. *See,* 13 A.L.R.3d Damages—Fraudulent Representation § 1.

The defendants direct our attention to a later case, *Coman v. Williams,* 65 N.W.2d 377, 379–380 (N.D.1954), wherein the court stated:

"Defendant's first point, however, raises a very serious question with regard to the sufficiency of the evidence on the amount of the damages. Under that point defendant claims that there is no evidence from which the jury could base

the actual value of the coats at the place and time of the transaction. Such value is a prerequisite foundation for the jury to determine the damages. Since the plaintiff retained the coats he is entitled to only such damages as he sustained above the market value of the coats he bought and for which he paid $700."

The *Coman* case involved the sale of some fur coats which were misrepresented to the plaintiff as being made of valuable furs when, in fact, they were only rabbit furs made to look like valuable furs.

The defendants further argue, since constructive fraud does not involve intent or *scienter* as does actual fraud, or a specific intent to deceive, that a logical and persuasive argument could be made for applying the out-of-pocket rule to this case. The Supreme Court of Wisconsin has adopted this position in the area of misrepresentation in the case of *Gyldevand v. Schroeder*, 90 Wis.2d 690, 280 N.W.2d 235 (1977), wherein the court stated that the measure of damages for fraudulent misrepresentation is the benefit of the bargain rule, but for negligent misrepresentation the out-of-pocket damage rule applies.

For us to follow the defendant's rationale for applying a lesser measure of damages for constructive fraud than we would for actual fraud, however, overlooks the principle of constructive fraud—that is, that certain relationships impose on one party a duty to another and a breach of that duty is treated as fraud, with no regard to the state of mind or intention of the one who breached it.

The cases involving the issue of what measure of damages is proper in cases of misrepresentation are so inconsistent that a California Court of Appeals said in *Overgaard v. Johnson*, 68 Cal.App.3d 821, 137 Cal.Rptr. 412, 413 (1977), a case involving a sale of a vineyard containing less acreage than indicated on sale documents:

> "Part of the difficulty in analysis of the law in this type of case arises out of a veritable gallimaufry of confusing rules gleaned from different types of actions. Some of these cases are based on contract, others on fraud (actual or constructive) and still others on unjust enrichment (disgorging of secret profits). The rules of these cases are then misinterpreted or applied to inappropriate fact situations. . . . We often look upon the out of pocket rule and the benefit of the bargain rule as being the sole antagonists on the battlefield of damages when at times neither is truly applicable. Consequently, it is easily understood how a trial judge could use an incorrect measure of damages."

We do not agree with the trial court's application of a strict benefit of the bargain measure of damages in the instant case. Land sales involving misrepresentation involve two kinds of cases: one is where the purchaser intends to purchase a tract in gross rather than a quantity in acres or by dimensions; the second is where a purchaser intends to purchase a number of acres or by dimensions. If purchasing by dimensions a purchaser is damaged if the seller fraudulently misrepresents the dimensions. *See, Holcomb v. Hoffschneider*, 297 N.W.2d 210, 213 (Iowa 1980).

The record indicates that this is a case in which Asleson intended to purchase a tract and not a specific amount of acreage. At trial Asleson testified on cross-examination as follows:

"Q. (Ms. Dvorak) Okay. So, would it be a fair statement, Mr. Asleson, that the zoning of this property as multi was very important to you?

"A. (Mr. Gary Asleson). Yes.

"Q. And was the zoning for this as multi family dwelling at the number of thirty-five very important?

"A. I would say so, yes.

"Q. Was it your prime consideration?

"A. Do you mean the fact that it was a number thirty-one [*sic*]?

"Q. That's right. It was a prime consideration in determining a price?

"A. Yes.

"Q. I see. Was it not a prime consideration in purchasing?

"A. No.

"Q. What was your prime consideration in purchasing?

"A. I suppose that there would be two. One would be the fact that it was zoned for multi-units and secondly, the price that we could buy the property for.

"Q. So, the number thirty-five would be a prime consideration in arriving at that price?

"A. Yes."

This testimony indicates that Asleson relied on the listing for calculating the price he was willing to pay for the tract using a cost per unit basis. The trial court in its amended findings of fact no. 10 specifically stated that Gary Asleson, in calculating the amount he would pay for the property and whether or not to accept the defendants' counter offer, "figured the price of each unit of land at approximately $1,857 for 35 units or townhouses". The record does not indicate how many townhouses he was trying to put on the lot when he discovered the error in the zoning status of the property.

As Asleson stated, the number 35 was a prime factor in calculating the price of the lot but whether or not the lot could accommodate 35 townhouses was not a prime factor in inducing him to purchase it. Because of this we do not believe that Asleson is entitled to recover the benefit of his bargain. He got the piece of property that he wanted at the price he was willing to pay for it. The lot was zoned for multi units and that was one of his prime considerations for purchasing it and that consideration was not defeated in this case. His second prime consideration was the price at which he could purchase the property. Therefore, his purpose for buying the property was not defeated but he paid more than he would have paid had he known the lot was zoned for only 30 townhouses. We do not know from the record what he would have offered for the lot calculating on a cost per unit basis for 30 units. A professional appraisal of Lot 18, Block 1 by Ray Reilly Appraisal Consultants, Inc. of Grand Forks states that the value of the property as of the date of purchase by Asleson was $72,000. The appraisal was stipulated to by Asleson and admitted into evidence at the trial.

Based on the facts of this case we do not believe that Asleson has been damaged by the misrepresentation on the listing sheet to the extent that he should recover benefit of the bargain damages. Nevertheless, the general rule that a variation in acreage in what the parties had contemplated in the land sale in gross is not grounds for rescission or other relief does not necessarily apply to a sale in gross induced by material misrepresentation. 55 Am.Jur., Vendors and Purchasers, § 129, p. 604. The misrepresentation as to the zoning status of the property was a material factor in Asleson's calculations for determining what price he was willing to pay for the property. Therefore, we believe that Asleson is entitled to some relief but that the damages awarded by the trial judge were excessive.

A strict application of the out-of-pocket rule in this case would result in Asleson having suffered no damages because the appraised value of the property at the time of the transaction was more than the price that he paid for it. Asleson was damaged, however, to the extent that he paid more for the property than he would have had he calculated the amount he was willing to pay for the property on the basis of the correct zoning status of the property. Our problem is that we do not know what Asleson would have paid for the property had it been correctly listed at 30 units. Testimony at the trial indicates that the smaller the number of units on a lot the greater is the value and the cost of the land per unit because fewer units on a lot results in greater green space or larger units which enhance the value of the land for each unit.

Nevertheless, we cannot disregard the fact that Asleson received a check for $1,950, which represents one-half of the total commission on the sale, the other commission check for $1,950 going to Valley Park as the listing agent. Asleson's receipt of this commission check, even if in the nature of a customary discount to a real

estate agent on the price of the property, implies a certain involvement on his part in the transaction. Asleson was a knowledgeable purchaser and his broker's license enabled him to consummate the sale himself. The trial judge recognized that Asleson received one-half of the commission and he deducted from his damages calculation the amount of $1,950. We believe that to the extent Asleson shared in one-half of the commission we are justified in reducing Asleson's recovery by one-half of the damages awarded by the trial court, that is, by the sum of $3,667.50.

As a *caveat* to our holding, we point out that our reducing the damages in this instance is not to be interpreted to be the result of an agency relationship between Asleson and the defendants. Therefore, we affirm the trial court with respect to constructive fraud and modify the damages so as to give Asleson $3,667.50 which represents one-half of the award granted by the trial court. *See e. g.,* 13 A.L.R.3d 875 at 927 (1967).

## CONCLUSION

We believe that the record sustains the trial court's imposing liability on the defendants, West Branch and Valley Park, for constructive fraud. We have no problem imputing liability for the acts of Valley Park, as a listing agent, to West Branch, the owner of the property, because William Putnam was responsible for listing and selling West Branch's land and he was the president of West Branch as well as the owner of Valley Park. As the listing agent, Putnam had a duty to correct errors in his listings by notifying the MLS and to notify anyone who was negotiating for the listed property. Putnam erroneously listed Lot 18 Block 1 as zoned for 35 townhouses and Asleson relied on this misrepresentation in his calculations which led to his purchase of the property. He paid more for the property than he would have had he known the true zoning status of the property. Both of the defendants gained an advantage by this transaction. West Branch's land was developed and sold and Valley Park received a commission on the sale.

▬▬ The trial court determined that this transaction did not involve a typical listing agent—selling agent relationship and refused to impose liability on Asleson or The Asleson Company on the basis of an agency between Valley Park as a listing agent and Asleson as a selling agent. A finding of agency is a finding of fact which will not be overturned unless clearly erroneous. Rule 52(a), N.D.R.Civ.P., *Pfliger v. Peavey Co.,* 310 N.W.2d 742 (N.D. October 6, 1981), and we are not convinced that the trial court erred in this matter. Therefore, there was no duty arising from an agency relationship which required Asleson to discover the error in the listing prepared by Putnam or which would subject Asleson to liability for failure to do so. There being no such duty, the trial court's dismissal of defendants' counterclaim against Asleson was correct.

▬▬ Asleson's status as a real estate broker is a factor in determining whether or not his reliance on the listing was unreasonable or unjustified. The trial court found that Asleson relied on the listing sheet and conversations with the defendants. The record indicates there was nothing which would have placed Asleson on notice that there was an error in the listing. We believe that the nature of the MLS requires that users of the service be entitled to rely on material statements of fact contained in listings without having to double check the work of the listing agent unless the user is put on notice that there is an error. The misrepresentation of the zoning status of Lot 18 Block 1 in the instant case was a material factor in Asleson's calculations and in determining what he was willing to pay for the property.

Our only exception to the judgment by the trial court is the award of damages. Asleson's damages were not for lost acreage entitling him to the benefit of the bargain measure of damages as determined by the trial court. He was damaged to the extent that he paid more for the property than he would have had he known the correct zoning status of the property.

For the reasons herein stated, the judgment of the district court is therefore, reduced from $7,335 to $3,667.50, the plaintiffs to have interest from October 18, 1978, to December 9, 1980, and costs and disbursements in the amount of $147.50. As so modified the judgment is affirmed.

ERICKSTAD, C. J., and SAND and VANDE WALLE, JJ., concur.

PEDERSON, Justice, concurring specially.

At oral argument counsel stated that this appeal is governed by Rule 52(a), NDRCivP. The briefing and oral argument did not otherwise relate to any specific finding of fact made by the trial court. I am satisfied that a few dismissals of appeals would cure some of the ailments of the judicial system. Nevertheless, the results reached by Justice Paulson, after a good deal of de novo consideration, provide substantial justice. I would have preferred to remand to permit the trial court to recompute the amount of damages. Rule 59(b)(5), NDRCivP, suggests that we should give the winner the choice of a reduction or a new trial.