GYLDENVAND, Plaintiff-Appellant, v. SCHROEDER, Defendant-Respondent.

Supreme Court

*No. 76–699.  Submitted on briefs May 31, 1979.—
Decided June 29, 1979.*   .
(Also reported in 280 N.W.2d 235.)

For the appellant the cause was submitted on the brief of *Allan Cain* and *Mary Lou Robinson,* both of Appleton.

For the respondent the cause was submitted on the brief of *Steven D. Shambeau* of Waupaca.

DAY, J. This is an appeal from a judgment entered January 17, 1977 in the county court for Waupaca County, the Honorable A. Don Zwickey, presiding. The case began as a small claims action commenced by Lualyn Gyldenvand for rent owed for pastureland. Tim Schroeder counterclaimed for damages arising from Mr. Gyldenvand's alleged misrepresentation as to the registration of certain cattle. The jury found that Mr. Schroeder sustained an out-of-pocket loss of $12,500. Judgment was entered for Mr. Schroeder for $9,945 as damages and $124.60 for costs and disbursements.

The questions on appeal are:

1. Did the failure to object to any of the special verdict questions waive any alleged error in the questions?

We hold that it did.

2. Was there any credible evidence to support the damages assessed by the jury?

We hold there was not and reverse the judgment.

In about 1970, Lualyn Gyldenvand and Tim Schroeder entered into a partnership to raise cattle. There was no written agreement, but the arrangement was that Mr. Gyldenvand would take care of the finances and paper work and Mr. Schroeder would actually raise the animals. The two men agreed to begin breeding Simmentals, a particular breed of cattle. This involved the artificial insemination of cows by pure bred Simmental bulls until eventually a "pure bred" animal defined as 15/16 Simmental was produced.

In the spring of 1974, Gyldenvand and Schroeder decided to register their cattle with the American Simmental Association. Mr. Schroeder testified that they went through the steps necessary to register the cattle, weighing them, tagging and tattooing them. He said that he and Gyldenvand filled out the application forms to register the cattle at Schroeders' kitchen table. Mr. Gyldenvand left Mr. Schroeder's home with the application forms. It was Mr. Schroeder's understanding that the papers would be sent in right away. Mr. Gyldenvand testified that when he left Schroeder's home, he did not have all the necessary information to register the animals. However, on cross-examination, he conceded that he never told Mr. Schroeder that he needed more information before he could register the animals. He also testified as follows:

"Q. You heard both Mr. Schroeder and Mrs. Schroeder testify that you walked out of their kitchen with the application form and the breeding receipts and they had the impression from you that you were going to send that in; is that correct?
"A. That is correct.
"Q. And you are saying that's not true?
"A. No, I am saying that I was going to.

"*Q.* But you just failed to do it; is that correct?

"*A.* No, it had not yet been done at the time of the sale. I did not say tomorrow or the next day."

In the summer of 1974, Mr. Schroeder bought out Mr. Gyldenvand's interest in the business for $13,520. This price was based on the assumption that the cattle were registered, and Mr. Schroeder testified that he would not have paid that price had he known the cattle were unregistered. At the time of the sale, he asked Mr. Gyldenvand for the registration papers, but Mr. Gyldenvand told him that the papers were still being processed, and that it could take from sixty to ninety days for them to come back.

Subsequently, Mr. Schroeder had an offer of $15,000 to purchase eight cows and three bull calves. He went back to Mr. Gyldenvand and asked for the papers in September, 1974, but was told that there were no papers. Finally, Mr. Schroeder called the American Simmental Association in Montana and was told that there was no record of his registration application. In fact, the Association did not even list him as a member.

Mr. Schroeder testified that he confronted Mr. Gyldenvand with this information: "So I went to Mr. Gyldenvand and asked him about it; and he said he must have forgot to renew the membership; and I said, there is no such thing as a renewal membership. It is $100, you are lifetime member; and he had nothing to say." The buyers did not want the cattle unregistered, and the sale fell through.

Mr. Schroeder borrowed the money to register the animals himself. It cost him $1,865 to register the animals, instead of the $354 it would have cost four months earlier. One of the buyers came back, and offered to buy the whole herd for $30,000. He paid $2,000 down, but his corn crop froze and he could not pay the

rest of the money. After this the market fell for Simmental cattle. Mr. Schroeder ultimately sold the herd for $6,500.

The first question of the special verdict read "Did Gyldenvand make the representation of fact to Schroeder that he would send in registration applications in the spring of 1974 and/or did he later and before July 24, 1974, state to Schroeder that he had done so?" The jury answered "yes." The jury also found that such representation was untrue, and that Gyldenvand was negligent in making such representation. The jury found Gyldenvand eighty percent negligent and Schroeder twenty percent negligent. Negligence was the only theory submitted to the jury.

Counsel for Mr. Gyldenvand made no objection to any aspect of the special verdict questions or to the jury instructions.

## QUESTION #1: DID THE FAILURE TO OBJECT TO ANY OF THE SPECIAL VERDICT QUESTIONS WAIVE ANY ALLEGED ERROR IN THE QUESTIONS?

Mr. Gyldenvand argues on appeal that the first question of the special verdict was fatally defective because it was duplicitous, making it impossible to determine how the jury answered the question. He also maintains that the right to have the question reviewed was not waived by the failure to object because the error went to substance, not form.

This court has consistently held that failure to object to the special verdict before it is submitted to the jury waives an appeal of right. *Roach v. Keane,* 73 Wis.2d 524, 535, 243 N.W.2d 508 (1976). However, an exception to that rule occurs when the defect is not formalistic, but is of substance and renders the verdict void. *Vroman v. Kempke,* 34 Wis.2d 680, 150 N.W.2d 423

(1967) ; *Johnson v. Heintz,* 61 Wis.2d 585, 593–594, 213 N.W. 2d 85 (1973).

The distinction was explained at some length in *Vlasak v. Gifford,* 248 Wis. 328, 333–334, 21 N.W.2d 648 (1946) :

"The subject of duplicitous questions and fatally defective verdicts based on answers to such questions has frequently received the attention of this court. If a question in a special verdict is so drafted as to present to the jury more than one question, and it is impossible to determine whether some of the jury did not answer one question and some another, the verdict is fatally defective. The defect in the question is formal but the defect in the verdict is one of substance and the verdict is void. If no objection is taken to the form of the verdict, and the answer of the jury is such as to raise no ambiguities as to the extent of the finding, the verdict is valid and the formal defect is waived by failure to object. It is necessary to make a distinction between the form of the question and the validity of the verdict because the ultimate fate of the verdict depends upon the answer given to the question. For example, when the special question puts more than one question conjunctively, and the jury's answer is in the negative, the verdict is fatally defective because it is impossible to know whether all the jury found in the negative as to each of the questions included in the submitted question. Where the special question contains several questions disjunctively put, and the jury's answer is 'Yes' the same result follows. It is impossible to determine what the jury has found as to any one of the questions duplicitously included in the special question. In connection with this see *Berger v. Abel & Bach Co.,* 141 Wis. 321, 124 N.W. 410. Thus, it will be seen that when no objection is made to the form of the question, the person failing to make such objection takes the risk that the duplicitous question will be so answered as to leave nothing but a formal defect which he has waived by not objecting. If, however, the answer of the jury is such as to make it impossible to know what they have found, the verdict is fatally and substantially defective."

This distinction was abolished with the adoption of the new rules of civil procedure. Sec. 805.13(3), Stats. (1975) provides:

"805.13. **Jury instructions; form of verdict.** . . . (3) INSTRUCTION AND VERDICT CONFERENCE. At the close of the evidence and before arguments to the jury, the court shall conduct a conference with counsel outside the presence of the jury. At the conference, or at such earlier time as the court reasonably directs, counsel may file written motions that the court instruct the jury on the law, and submit verdict questions, as set forth in the motions. The court shall inform counsel on the record of its proposed action on the motions and of the instructions and verdict it proposes to submit. Counsel may object to the proposed instructions or verdict on the grounds of incompleteness or other error, stating the grounds for objection with particularity on the record. *Failure to object at the conference constitutes a waiver of any error in the proposed instructions or verdict.*" (Emphasis added.)

Sec. 805.13 replaced former sec. 270.21. However, sub. (3) was new language. See Judicial Council Committee's Note, 1974. The adoption of the new rule abolished the formal/substantive distinction in the earlier cases by providing that failure to object to the verdict waives any error. (67 Wis.2d at 703.)

The failure to object to instructions under this section was discussed in Graczyk, *The New Wisconsin Rules Of Civil Procedure: Chapters 805–807,* 59 Marquette L. Rev. 671, 700 (1976) and a similar view was taken:

"Subsection (3) requires the court to inform counsel of the proposed instructions and special verdict questions, although the rule does not state when this notification must be made or whether the court must inform counsel of the precise language which the court will use. Presumably, notification of counsel may occur prior to the post-evidence conference.

"The new rule permits counsel to object to the instructions proposed by the judge on the grounds of 'com-

pleteness or other error,' thereby eliminating the distinction between instructions which have material omissions and instructions which inaccurately state the law. Under the former practice, when an instruction given was incomplete, counsel had a duty to object at the time the instruction was given or else waive his claim of error, whereas if the instructions given erroneously stated the law, counsel was not required to object, but simply had to move for a new trial on that ground. Under subsection (3) counsel must object to an instruction which he considered to be inadequate on any ground."

Thus, whether the defect was one of form or substance, Mr. Gyldenvand waived the right to review the alleged error by failure to object.

QUESTION #2: WAS THERE ANY CREDIBLE EVIDENCE TO SUPPORT THE DAMAGES ASSESSED BY THE JURY?

The general rule for appellate review of damage awards, as for other factual questions, is that any credible evidence of the damage claimed is sufficient to sustain the jury's award. *Roach v. Keane, supra,* 73 Wis.2d at 539.

In cases of fraudulent misrepresentation, the measure of damages adopted in Wisconsin is the "benefit of the bargain" rule under which the measure of damages is the difference between the value of the property as it was when purchased and what it would have been if it had been as represented. *Anderson v. Tri-State Home Improvement Co.,* 268 Wis. 455, 464, 67 N.W.2d 705 (1955) ; Wis. J.I. Civil—2405. There do not appear to be any Wisconsin cases on the measure of damages in cases of negligent misrepresentation. However, the standard jury instruction recites the "out-of-pocket" rule for

such cases—the difference between the market value of the property as it was when purchased and the amount the plaintiff paid for it. Wis. J.I. Civil—2406.

Prosser, *Law of Torts* (Hornbook Series, 4th Ed. 1971), p. 734, suggests that the "out-of-pocket" rule as a matter of logic, is more consistent with the purpose of tort remedies, which is to compensate the plaintiff for loss sustained, rather than to give him the benefit of any contract bargain. That treatise notes that it has been suggested that the loss of bargain rule should be applied in cases of intentional misrepresentation, while the out-of-pocket rule should be applied where the misrepresentation is innocent. We hold that the out-of-pocket rule applies where negligent misrepresentation is found.

In the instant case, both parties acquiesced in the trial court's giving of the "out-of-pocket" instruction to the jury.

There was no instruction as to consequential damage, nor does the record reflect a request for one. Dobbs, *Remedies* (Hornbook Series, 1973), p. 598 states that in addition to a recovery of general damages under either the loss-of-bargain or out-of-pocket rules, the plaintiff in a deceit action may recover such consequential or special damages as he is able to prove with reasonable certainty, provided they do not duplicate a recovery already gained under the general measure of damages. Recovery of consequential damages may also be limited to such damages which were proximately caused by the misrepresentation or by such damages as were within the contemplation of the parties at the time of the misrepresentation. *Id.* at 602. We hold that the recovery of consequential damages is not limited to cases of intentional deceit. They may also be appropriate in cases of negligent misrepresentation.

The evidence in the case at bar was that Mr. Schroeder bought out Mr. Gyldenvand's interest in the business for $13,520. The price included Gyldenvand's interest in thirty-three head of cattle,[1] equipment and feed.[2] The testimony does not specify how much of the purchase price went for the registerable, but as yet unregistered cattle, and how much for the other animals. Mr. Schroeder estimated his damages by multiplying the total number of pounds represented by the herd, 28,700, by twenty-five cents per pound, yielding $7,175 as the value of the whole herd unregistered. However, this erroneously assumes that the value of registerable but unregistered cattle would be the same as cattle not eligible for registration.

Under these facts the jury determination of damages was speculative, and the case must be remanded for a redetermination of out-of-pocket and possibly consequential damages.

The loss of profits from the first sale when Mr. Schroeder was offered $15,000 for eleven animals may be a consequential loss resulting from the misrepresentation depending on all the facts and circumstances. Up until that time, Mr. Schroeder had relied on Mr. Gyldenvand's statements that the registration papers had

---

[1] Mr. Schroeder's exhibit A listed the thirty-three head of cattle as:

5 Charlois cows;
6½ Simmental  ½ Brown Swiss cows
6½ Simmental  ½ Holstein cows
5½ Simmental  ½ Charlois heifers
4¾ Simmental heifers
4¾ Simmental bull calves
1¾ Simmental bull (16 months)
1½ Simmental  ½ Charlois bull calf (9 months)
1 Holstein-Charlois steer

[2] Paragraph 5 of defendant Schroeder's counterclaim alleged that $255.00 of the purchase price was for all the equipment and personalty of the partnership. The answer to the counterclaim admitted this allegation.

been sent in and were still being processed. After discovering that the papers had never been sent in, Mr. Schroeder took action to register the animals himself.

We hold that there must be a new trial in the interest of justice (sec. 751.06, Stats.) on the issue of damages only but that the prior determination of the jury on negligent representation and apportionment of negligence between the parties shall stand and be applied to any finding on damages.

*By the Court.*—Judgment reversed and cause remanded for further proceedings not inconsistent with this opinion.