Stacy BOLES, Jeimale Allan, and Cresha Riley, minors by their legal guardian, Earlean McKinney, Plaintiffs-Respondents,

v.

MILWAUKEE COUNTY, a municipal corporation, Defendant-Appellant. †

Court of Appeals

*No. 88–1185. Submitted on briefs March 8, 1989.—Decided May 11, 1989.*

(Also reported in 443 N.W.2d 679.)

† Petition to review dismissed.

For the defendant-appellant the cause was submitted on the briefs of the *Milwaukee County Corporation Counsel,* with *Robert A. McKnight,* principal assistant corporation counsel, of counsel, of Milwaukee.

For the plaintiffs-respondents the cause was submitted on the briefs of *Mulcahy & Wherry, S.C.,* with *Alyson K. Sloan,* of counsel, of Milwaukee.

Before Moser, P.J., Sullivan and Fine, JJ.

SULLIVAN, J. Milwaukee County (County) appeals from a judgment awarding damages to the minor children of the late Dorothy J. Boles (Boles) for its negligence in the care accorded her during the one hour and forty-two minutes she was at the Milwaukee County Medical Complex (Complex) emergency room. A jury found that the County was 100% at fault for Boles' instantaneous death after she left the Complex.

The salient facts are undisputed. Boles, born January 28, 1958, had a history of mental illness. In the afternoon of December 3, 1983, she was stricken with an acute episode. Her older sister, Audrey Laster (Laster) had stopped at Boles' home to pick her up for a shopping trip. After Laster observed Boles drop a telephone, recite "Jesus saves, Jesus saves" and strike herself repeatedly on the chest, Laster called a Paratech ambulance which conveyed Boles to the Complex. Laster followed in her own car. At the Complex, Laster signed an authorization and consent for emergency services for her sister and for release of information to any hospital or doctor for continued care. Laster remained in a nearby waiting room. She had Boles' coat, purse and wig. Boles was admitted to the emergency room at 2:25 p.m. and recorded as discharged at 4:15 p.m. She left at approximately 4:07 p.m.

An entry into the hospital record by registered nurse Barbara Buettner recites that Boles told the hospital employees that they were not gods. Boles then attempted to stand upon an emergency room cart, but quieted down when security officers were called. Boles was placed in four-point soft restraints. When Boles slid down to the end of the cart, a chest restraint was applied. At 2:50 p.m., Boles told Nurse Buettner that she was "alright

now" and wanted to return home. Nurse Buettner told Boles that it would be a good idea for her to stay and talk with a psychiatrist.

At 3:10 p.m., Dr. Theodore J. Galvani, Jr., a resident in emergency medicine, examined Boles. Dr. Galvani testified that in his opinion Boles was a danger to herself. Dr. Galvani's final diagnosis was "paranoid schizophrenic exacerbation." He ordered psychiatric consultation and telephoned the psychiatrist resident about the case. By the time the psychiatrist arrived, 4:15 p.m., Boles had left. Boles was last seen by Nurse Donna Manhardt (Manhardt) at 3:20 p.m. At that time, Nurse Manhardt noted that Boles was resting quietly in full soft restraints.

Two security officers were on duty when Boles left the hospital. Neither of them had an independent recollection of her departure. However, the entries in their notebooks indicate that Boles was either observed or escorted from the main information desk of the Complex to a public bus at 4:07 p.m.

At 5:40 p.m., Boles was pronounced dead on arrival at St. Mary's Hospital. She had been shouting at cars and hitting them with her hands near 1359 North Lincoln Memorial Drive, in Milwaukee. Boles was struck and killed by an automobile, when she ran into the roadway. She sustained multiple injuries, including broken legs and a fractured neck. The death certificate listed the cause of death as cervical vertebral fractures with hemothorax.

## NEGLIGENCE

The County argues that Dr. Galvani and the Complex staff had no authority to detain Boles, and that Chapter 51, Stats., provides the only vehicle to forcibly

detain a mentally ill individual.[1] The County also notes that a voluntary commitment to a treatment facility is available only upon approval of the treatment director after certain criteria have been fulfilled.[2] The County contends that neither of these alternatives were available to the Complex emergency room staff, and therefore Dr. Galvani, the nursing staff, and the security officers had no duty to prevent Boles' departure.

We disagree. The issue is not whether Boles was a fit subject for involuntary commitment or whether she met the criteria for voluntary commitment. The issue is whether the Complex, in the administration of its emergency room, violated a duty of care to Boles. *See Payne v. Milwaukee Sanitarium Found., Inc.,* 81 Wis. 2d 264, 272, 260 N.W.2d 386, 390 (1977). Upon Boles' admission to the Complex, its duty to her was one of ordinary care under the circumstances. *See id.* "The general rule is that a hospital must in the care of its patients exercise such ordinary care and attention for their safety as their mental and physical condition, known or should have been known, may require." *Cramer v. Theda Clark Memorial Hosp.,* 45 Wis. 2d 147, 149, 172 N.W.2d 427, 428 (1969).

In *Pamperin v. Trinity Memorial Hospital,* 144 Wis. 2d 188, 423 N.W.2d 848 (1988), the supreme court held that a hospital was liable for the negligence of an emergency room physician who was an independent contractor, since the hospital had apparent authority over the physician. There the supreme court held that the care to which the patient is entitled "consists of both direct care and support services." *Id.* at 193, 423 N.W.2d at 850. The question therefore is whether Dr. Galvani

---

[1] Section 51.20, Stats., provides for involuntary commitment for treatment.

[2] *See* secs. 51.10(2), (4), and (4m), Stats.

and his supporting staff exercised ordinary care to Boles under the circumstances presented. *See Payne*, 81 Wis. 2d at 272, 260 N.W.2d at 390 (1977).

The jury found the County negligent as to the care, safety and attention provided Boles. On appeal, the County does not directly assail this finding. It is undisputed that after his examination, Dr. Galvani requested a psychiatric evaluation for Boles and requested nurses' observation of her. He was satisfied that she should remain in restraints. We are convinced that credible evidence supports the jury's finding because the Complex failed to monitor or restrain Boles until she could be examined by the resident psychiatrist. It also failed to observe her,[3] and to request Laster to remain with her. We confirm a verdict which is supported by credible evidence, particularly where it enjoys trial court approval. *Fehring v. Republic Ins. Co.*, 118 Wis. 2d 299, 305, 347 N.W.2d 595, 598 (1984).

### EVIDENCE

The County argues that the trial court erred in admitting expert opinion evidence tending to establish its negligence. The County asserts that the trial court abused its discretion in denying its motion to suppress the testimony of Marshall Segal, M.D. and a video deposition of Mark Olsky, M.D., both of whom qualified as experts in emergency medicine. Drs. Segal and Olsky both testified to the duty of the emergency physician and supporting staff to protect the emergency patient until the patient is placed in the care of those who can

---

[3] The emergency room was located across the hall from the nursing station. However, no one checked on Boles between 3:20 p.m. and 4:15 p.m.

take necessary action. The County's position is that the alleged negligent failure to apply restraints properly did not require exposition by experts. *See Cramer,* 45 Wis. 2d at 150, 172 N.W.2d at 428 (1969) (expert testimony unnecessary for ministerial or routine care in a hospital).

However, in its postverdict motions for a new trial, the County failed to specify this alleged error. In *Wells v. Dairyland Mut. Ins. Co.,* 274 Wis. 505, 518, 80 N.W.2d 380, 387 (1957), the supreme court stated:

> We deem the correct rule to be that no error of the court should be reviewable *as a matter of right* on appeal without first moving in the trial court for a new trial bottomed on such error, if the error is of a category that a trial court could correct by granting a new trial. [Emphasis in original].

Admission of the experts' testimony was of a category which could be corrected by the trial court grant of a new trial. We decline to entertain the argument.

## INSTRUCTIONS

The trial court charged the jury with respect to Boles' duty of care for her own safety. The court said:

> In this case, evidence has been received that Dorothy Boles at the time of the accident that caused her death on December 3, 1983 was mentally ill. It is the law that a person who is mentally ill may be held to the same standard of care as one who has normal mentality. However, the plaintiffs have denied that Dorothy Boles failed to exercise ordinary care for her own safety on the ground that, without prior warning, Dorothy Boles was subjected to an illness that affected her ability to understand and appreciate her duty to exercise ordinary care for her own safety.

810

The law of Wisconsin is that where an individual through unexpected illness commits an act or omits a precaution which would otherwise constitute negligence, such act or omission is not negligence if the occurrence of such illness was not preceded by sufficient warning that a person of ordinary intelligence and prudence ought reasonably to foresee that his or her actions would subject a person to an unreasonable risk of injury.

However, when the occurrence of such illness should have been reasonably foreseen, then the person so disabled may be found negligent—may be be [sic] found negligent if such person should reasonably have foreseen that such illness would occur and effect [sic] her as to her own safety.

The trial court tailored Wis J I—Civil, secs. 1021 and 1021.2 to make it expositive of Boles' negligence and her duty of care to herself.[4]

---

[4] Section 1021 states:

NEGLIGENCE OF MENTALLY ILL
Evidence has been received (it appears without dispute) that the defendant at the time of (collision, accident, fire, or other alleged tort) was mentally ill. It is the law that a person who is mentally ill is held to the same standard of care as one who has normal mentality, and in your determination of the question of negligence, you will give no consideration to the defendant's mental condition.

Section 1021.2 states:

ILLNESS WITHOUT FOREWARNING
The defendant has denied that he was negligent in the operation of his automobile on the ground that, without prior warning, he was subjected to an illness that affected his ability (to understand and appreciate his duty to exercise ordinary care in driving his car) (to control his car in an ordinarily prudent manner).

The law of Wisconsin is that where a driver, through sudden illness or loss of consciousness, commits an act or omits a precaution which would otherwise constitute negligence, such act or omission is not negligence if the occurrence of such illness or loss of consciousness was not preceded by sufficient warning that a person of ordinary

The County insists that the charge relating to an unexpected illness has no basis in the record and effectively exonerated Boles from the consequences of her own negligence. The County argues that because the evidence conclusively shows that Boles suffered from mental illness for many years and that she was aware of her illness, the charge was inappropriate; the jury instruction dealt with a sudden and unexpected onset of which the County alleges that there is no supporting proof. The County argues that the jury should not have been given the opportunity to conjecture that Boles had no knowledge of her mental illness and that, if not restrained, she might injure herself.

Generally, a trial court possesses a wide discretion in formulating and presenting the jury instructions. *Meurer v. ITT Gen. Controls,* 90 Wis. 2d 438, 448–49, 280 N.W.2d 156, 162 (1979). The instruction should be warranted by the evidence and not submitted unless tailored to fit evidence in the record. *See Foss v. Town of Kronenwetter,* 87 Wis. 2d 91, 106, 273 N.W.2d 801, 809 (Ct. App. 1978).

The record contains evidence that Boles suffered periodically from mental illness for many years.[5] It also

intelligence and prudence ought reasonably to foresee that he would, by driving a car, subject the person or property of another or of himself to an unreasonable risk of injury or damage.

However, when the occurrence of such illness or loss of consciousness should have been reasonably foreseen, then the person so disabled may be found negligent. The negligence is not in the manner of driving, but rather in driving at all, if such person should reasonably have foreseen that such illness or lack of consciousness might occur and affect his manner of driving.

[5] Laster testified that in about 1975, or sometime afterwards, she overheard Boles talk to a psychiatrist on the telephone.

established that Boles may have had a sudden and violent onset on December 3, 1983. Laster described the incident at Boles' home, and later that day Dr. Galvani described the illness as an "exacerbation." Whether the condition was without forewarning or whether it was a continuation of an ongoing illness presented a jury issue. The trial court properly instructed on both alternatives and commendably modified the standard charge to meet the particular issues presented.

## DAMAGES—STATUTORY LIMIT

The County takes the position that the plaintiffs' recovery under sec. 893.80(3), Stats.,[6] should be limited to $50,000 for the three children as a class, and not $50,000 for each child. The application of a statute to an undisputed set of facts is a question of law. *Ball v. District No. 4, Area Bd.,* 117 Wis. 2d 529, 537, 345 N.W.2d 389, 394 (1984). If a statute is plain and unambiguous, we must apply its plain meaning. *Tahtinen v. MSI Ins. Co.,* 122 Wis. 2d 158, 167, 361 N.W.2d 673, 678 (1985). A statute is ambiguous if reasonable, well-informed persons could disagree as to its meaning. *Standard Theatres, Inc. v. State,* 118 Wis. 2d 730, 740, 349 N.W.2d 661, 667 (1984). We are not free to consult extrinsic sources to ascertain the meaning of a statute, if it contains no ambiguity. *Tahtinen,* 122 Wis. 2d at 166, 361 N.W.2d at

---

[6] Section 893.80(3), Stats., provides in part:

The amount recoverable by *any person* for any damages, injuries or death in any action founded on tort against any . . . political corporation, governmental subdivision or agency thereof and against their officers, officials, agents or employes for acts done . . . in the course of their agency or employment . . . shall not exceed $50,000 . . .. [Emphasis added.]

813

678. Neither party contends that sec. 893.80(3), Stats., is ambiguous and we ascertain no ambiguity.

To ascertain whether the word "person" found in subs. (3) refers to each child or whether it treats all of the children as a single class, we look to the language of the statute itself.[7]

The County argues that a wrongful death action, unknown to the common law, was created and defined by statute. Section 895.04(2), Stats., provides that if no spouse survives, the amount recovered shall vest in the deceased's lineal heirs as determined by sec. 852.01, Stats. Section 852.01 defines intestate succession. Therefore, the County concludes that the maximum recovery goes to the class limited by intestate succession.

We reject this argument because secs. 895.04(2) and 852.01, Stats., define who shall recover rather than the amount of recovery. Our conclusion is buttressed by the supreme court's holding in *Wood v. Milin,* 134 Wis. 2d 279, 397 N.W.2d 479 (1986). There, each of two joint tenants, who had suffered damages due to the negligent acts of a municipal building inspector, was permitted to recover the maximum under 893.80(3), Stats. *Id.* at 284–85, 397 N.W.2d at 481. The supreme court discussed sec. 700.17(2), Stats., which provides that each joint tenant has an equal interest in the entire property. The court further noted the various incidents of ownership enjoyed by each tenant. *Id.* The supreme court relied, in

[7] In *Gonzalez v. City of Franklin,* 137 Wis. 2d 109, 403 N.W.2d 747 (1987), the jury awarded an injured minor and his father each an amount in excess of the sec. 893.80(3) maximum. The supreme court affirmed a court of appeals reduction to $50,000 each for the father and son. The supreme court assumed each person was entitled to up to the $50,000 cap.

part, on *Gleason v. City of Oklahoma City,* 666 P.2d 786, 789 (Okl. Ct. App. 1983), which held, in a wrongful death suit brought by decedent's personal representative, that each claimant may recover the statutory maximum because each has suffered a separate loss.[8] We conclude that each of Boles' children, having suffered separately the loss of their mother, is entitled to recover up to the sec. 893.80(3) maximum.

## DAMAGES—PECUNIARY LOSS

Contending that the pecuniary loss awards have virtually no support in the record, the County insists either that this court should reduce them substantially or remand for a new trial.[9] Generally, an appellate court

---

[8] The *Gleason* court interpreted Okla. Stat. Ann. tit. 51, sec. 154 (1981), which stated that:

A.   The liability of a political subdivision or an employee on claims within the scope of this act shall not exceed:

1.   Twenty-five Thousand Dollars ($25,000.00) to *any claimant* for any number of claims for damage to or destruction of property, including consequential damages arising out of a single accident or occurrence;

2.   Fifty Thousand Dollars ($50,000.00) to *any claimant* for all other claims arising out of a single accident or occurrence; or

3.   Three Hundred Thousand Dollars ($300,000.00) for any number of claims arising out of a single occurrence or accident. [Emphasis added.]

The County argues that the Oklahoma statute is significantly different from sec. 893.80(3), Stats., because it uses the word "claimant" instead of "person." We disagree.

[9] The jury awarded the children as follows: to Stacy Boles, born January 1, 1975, $33,492.33; Jeimale Allan, born October 3, 1979, $44,936.33 and to Cresha Riley, born September 9, 1981, $51,265.33.

sustains an award of damages if there is any credible evidence to sustain it. *Gyldenvand v. Schroeder,* 90 Wis. 2d 690, 697, 280 N.W.2d 235, 238–39 (1979). An unemancipated child may recover pecuniary damages for the wrongful death of its parent. *Harris v. Kelley,* 70 Wis. 2d 242, 254, 234 N.W.2d 628, 633 (1975).

Boles lived at Westlawn Housing Project with her three children. Laster frequently visited her sister. She observed Boles help the children write and read. Boles purchased a set of children's encyclopedia which she read to her children. Laster also observed Boles sweeping the floor and washing dishes. Occasionally, Boles helped clean Laster's home. Laster, a divorced parent with four children, described Boles as an average housekeeper.

Although Boles had not graduated from high school, she planned to obtain a General Equivalency Diploma (G.E.D.) and study computer science. On June 9, 1983, the Milwaukee Area Technical College conferred a certificate of recognition upon Boles for outstanding effort in completing forty classroom hours in the Adult Basic Evaluation Program. This program leads to a G.E.D.

Boles was not employed at the time of her death and she had never held a full time job. Since her death, the children have lived with Boles' mother, Earlean McKinney.

The children called Dr. George R. Meadows (Meadows) to testify as to their pecuniary loss.[10] Professor Meadows testified that household work, including cook-

---

[10] Meadows is a faculty member at the University of Wisconsin-Milwaukee. He is an associate dean of social sciences in the College of Letters and Sciences and a professor, upon appointment, in the Department of Economics. Professor Meadows holds a Ph.D. in Economics from Washington University, in St. Louis and has done some consulting work for fifteen years.

ing, cleaning, child care and errands, has economic value even though no compensation is paid among family members. This is premised upon a need to pay for the services which would occur if the provider should become unavailable. One hypothesis assumed Boles would remain unemployed and would continue to provide services for the children during their minority. It factored-in components such as time-value discount, graduating price levels and inflation. Professor Meadows testified, without objection, that upon this hypothesis, Stacy's loss was $25,159, that Jeimale's was $36,603, and that Cresha's was $42,932.

The trial court charged the jury concerning the life expectancy of Boles and the children and instructed the jury on Wis J I—Civil, sec. 1880, pertaining to pecuniary loss. Credible evidence supports the elements of the pecuniary losses, their dollar value and the amount sustained by each child. The jury was correctly instructed. We find no reason to disturb the awards.

## INTERVENING AND SUPERSEDING CAUSE

The County argues that Boles' conduct, running onto Memorial Drive and striking at cars in moving traffic, was an intervening and superseding cause which exonerated it of any negligence. This presents a legal issue which is to be heard and determined by the trial court after the verdict has determined that the first actor's, (here the defendant's), negligence was a substantial factor in causing the harm. *Stewart v. Wulf,* 85 Wis. 2d 461, 476, 271 N.W.2d 79, 86 (1978).

The County, however, never raised this issue in the trial court. Therefore, the trial court never had the opportunity to decide it. We deem it waived and decline

to address it. *See Paape v. Northern Assurance Co.*, 142
Wis. 2d 45, 53, 416 N.W.2d 665, 668 (Ct. App. 1987).

## PUBLIC POLICY

The County, relying on *Coffey v. City of Milwaukee,*
74 Wis. 2d 526, 541, 247 N.W.2d 132, 140 (1976), posits
six public policy reasons why its liability should be inter-
dicted: (1) the injury is too remote from the negligence;
(2) Boles' injury is out of proportion to the County's
culpability; (3) in retrospect, it was highly extraordinary
that Boles' death would ensue from the County's negli-
gence; (4) Boles' recovery places an unreasonable burden
upon the County; (5) recovery would open up the door to
fraudulent claims; and (6) recovery would expose the
County to a limitless amount of liability.

Aside from a prefatory reference to *Coffey,* the
County has cited only one case authority in support of
its contentions.[11] The burden of research is left to the
court. However, this court is not required to consider an
argument unsupported by authorities. Sec. 809.19(1)(e),
Stats. Accordingly, we address only the argument sup-
ported by authority: that Boles' recovery imposes too
great a burden upon the County.

As noted in *Coffey,* a court determines a public pol-
icy argument, preferably, but not necessarily, after a full
factual resolution. *Coffey,* 74 Wis. 2d at 542, 247 N.W.2d
at 140. Without reference to statistical data, the County
directs our attention to numerous emergency room
patients who daily use urban hospital emergency rooms,
to persons who may be stressful because of consumption

---

[11] *Schuster v. Altenberg,* 144 Wis. 2d 223, 424 N.W.2d 159
(1988).

of drugs including alcohol or who may suffer from mental illness or developmental disabilities, many of whom may leave the emergency room against medical advice. The County deplores imposition of a duty upon emergency room physicians to institute appropriate mental health proceedings on behalf of the mentally ill. The County predicts that extension of *Schuster v. Altenberg*, 144 Wis. 2d 223, 424 N.W.2d 159 (1988), to the emergency room would result in a wave of lawsuits which would trammel further the efforts of overworked staffs to diagnose and treat emergency patients.[12]

The framework of negligence was graphic. Dr. Galvani diagnosed Boles as mentally ill and found her to be a danger to herself. His opinion was based in part on her history and by her demonstration of violence to herself at home and within the hospital emergency room. Dr. Galvani called for a psychiatric consultation. We conclude that the failure to monitor or detain Boles until completion of her examination palpably was negligence. It prevented a final diagnosis which would have resulted either in a Chapter 51, Stats., proceeding[13] or in discharge of Boles to Laster. From this negligence it was readily foreseeable that Boles, after being left on her own, would pursue a course of her own self-destruction.

The principal of public policy relied upon should not shield the County from liability. The rationale of this

---

[12] In *Schuster,* the supreme court stated that "if it is ultimately proven that it would have been foreseeable to a psychiatrist, exercising due care, that . . . by failing to take action to institute detention or commitment proceedings someone would be harmed, negligence will be established." *Id.* at 240, 424 N.W.2d at 166.

[13] Chapter 51, Stats., provides, *inter alia,* for voluntary admission, emergency detention and involuntary commitment.

case does not extend to those not mentally ill who leave an emergency room against medical advice. It is inapplicable to the non-dangerous mentally ill. However, we perceive no reason why a public hospital on notice that it is treating a severely psychotic patient, who is a danger to herself, should be excused from a duty to exercise ordinary care to periodically monitor or retain her until a diagnosis is completed and a course of action is determined.

In summary, the court concludes that:

(1)   credible evidence supports the jury finding of negligence in the care given Boles in the Complex emergency room;

(2)   the County waived review of the trial court's admission of expert evidence on the issue of the County's duty of care and of the trial court's jury charge defining that duty;

(3)   the trial court did not abuse its discretion when it tailored Wis J I—Civil, sec. 1021 and 1021.2 to fit the factual situation of this case;

(4)   Sec. 893.80(3), Stats., provides a recovery of $50,000 maximum for each of the plaintiffs;

(5)   credible evidence supports the jury award for pecuniary loss;

(6)   the County waived review of Boles' conduct as an intervening and superseding cause of her death;

(7)   the public policy argument that recovery would place an unreasonable burden on public hospital emergency rooms is rejected.

*By the Court.*—Judgment affirmed.

FINE, J. *(dissenting).*   I respectfully dissent from the majority's conclusion that public policy does not bar this action. Additionally, and at the very least, this

action—irrespective of the public policy issue—should be remanded for a new trial.

## I.

Although, as explained below in part II., I believe the majority opens a Pandora's box of potential problems by placing liability on hospital personnel under these circumstances, there is an additional and equally fundamental reason why this judgment should not stand. The jury found the County liable because the County's hospital failed to exercise ordinary care to restrain Boles pending diagnosis and evaluation. Yet, the jury was never told of the severe limits on the hospital's *right* to restrain her.

Under Wisconsin law, persons must exercise "ordinary care" in the course of their activities so as to avoid injury or harm to others or to the property of others. *See Schuster v. St. Vincent Hosp.*, 45 Wis. 2d 135, 141, 172 N.W.2d 421, 423–424 (1969). A person who fails to exercise ordinary care will generally be liable for any resulting loss. *See Thomas v. Kells,* 53 Wis. 2d 141, 144, 191 Wis. 2d 872, 873–874 (1971).[1] "The duty of ordinary care is simply that of the 'reasonable man' *under the circumstances.*" *St. Vincent,* 45 Wis. 2d at 141, 172 N.W.2d at 424 (emphasis supplied). Here, although the jury was given general instructions on negligence, it was not told about the legal restrictions on what the hospital could do.

---

[1] The Supreme Court has recently reiterated that " '[p]ublic policy considerations may preclude liability.' " *Schuster v. Altenberg,* 144 Wis. 2d 223, 240, 424 N.W.2d 159, 166 (1988) (quoting *Morgan v. Pennsylvania Gen. Ins. Co.,* 87 Wis. 2d 723, 737, 275 N.W.2d 660, 667 (1979)). The impact of public policy considerations on this case is discussed in part II.

The law in this state is clear. A person suspected of mental illness and who has not committed a crime may not be involuntarily detained *unless*:

— there is a "substantial probability of physical harm" to that person "manifested by evidence of recent threats of or attempts at suicide or serious bodily harm"; or

— there is a "substantial probability of physical harm to other persons as manifested by evidence of recent homicidal or other violent behavior" by that person or there is "evidence that others are placed in reasonable fear of violent behavior and serious physical harm to them, as evidenced by a recent overt act, attempt or threat to do serious physical harm" by that person; or

— there is a "substantial probability of physical impairment or injury to" that person "due to impaired judgment, as manifested by evidence of a recent act or omission"; or

— there is a "substantial probability" that a person will die or suffer serious physical injury or impairment because he or she is unable to provide for the basic necessities of life "as manifested by a recent act or omission."

Sec. 51.15(1)(a)1–4, Stats. Significantly, in connection with the only possible basis for Boles' involuntary detention under the facts of this case, the statute provides that there is not a "substantial probability of physical impairment or injury" to a person "if reasonable provision for the individual's protection is available in the community and there is a reasonable probability that the individual will avail himself or herself of these services . . .." Sec. 51.15(1)(a)3, Stats. As the majority recog-

822

nizes, although Boles had a history of mental illness, she was apparently able to live in the community without significant threat to either her well-being or the safety of those with whom she had contact. *See* majority op. at 816.

Unless any of the prerequisites to emergency detention set out in sec. 51.15(1), Stats., and summarized above, were met, Boles was free to leave the hospital at any time.[2] Indeed, approximately twenty-five minutes after her admission, Boles told a nurse that she felt better and wanted to go home. Boles left the hospital about an hour and twenty minutes later. Whether the hospital personnel violated a duty of ordinary care in permitting her to leave should not have been decided without reference to the attending circumstances: the legal limits of their authority set out in sec. 51.15(1), Stats.

## II.

Every person in this state has an obligation to exercise ordinary care and is generally liable for injuries or damage that result from a breach of that obligation as long as any harm is foreseeable "even though the nature of that harm and the identity of the harmed person or harmed interest is unknown at the time of the" breach. *A.E. Inv. Corp. v. Link Builders, Inc.,* 62 Wis. 2d 479, 483, 214 N.W.2d 764, 766 (1974). Liability may, however, be precluded by overriding considerations of public policy. *Altenberg,* 144 Wis. 2d at 240, 424 N.W.2d at 166. Among the factors to be considered are:

---

[2] While the prerequisites to Boles' emergency detention do not appear in the appellate record, the trial court's determination that sec. 51.15(1), Stats. was not relevant may have led counsel not to introduce evidence on this point.

(1)     the injury is too remote from the negligence; or

(2)     the injury is too wholly out of proportion to the culpability of the negligent tort-feasor; or

(3)     in retrospect it appears too highly extraordinary that the negligence should have brought about the harm; or

(4)     allowance of recovery would place too unreasonable a burden on the negligent tort-feasor; or

(5)     allowance of recovery would be too likely to open the way for fraudulent claims; or

(6)     allowance of recovery would enter a field that has no sensible or just stopping point.

*Id.* at 242-243, 424 N.W.2d at 167 (quoting *Garrett v. City of New Berlin,* 122 Wis. 2d 223, 233-234, 362 N.W.2d 137, 143 [1985]).

Holding hospital personnel liable for their failure to temporarily restrain persons under the circumstances present here and irrespective of the limits imposed by sec. 51.15(1), Stats., violates public policy for two reasons. First, it enters "a field that has no sensible or just stopping point." *See id.* at 243, 424 N.W.2d at 167. Second, it conflicts with the legislatively expressed policy of this state that no person should be temporarily detained against his or her will unless the specific—and, indeed, drastically narrow—prerequisites set out in sec. 51.15(1)(a), Stats., are satisfied.

A.

Pertinent to any analysis of whether public policy bars this action is *Altenberg,* which similarly concerned an attempt to impose liability for the alleged failure to

properly treat a mentally ill person. There, the trial court dismissed a complaint seeking to recover damages sustained as the result of an automobile accident in which Gwendolyn Schuster was injured and Edith Schuster, her mother, was killed. *Id.* at 226–227, 424 N.W.2d at 160–161. Edith Schuster was driving at the time of the accident and had been a patient under the care of Dr. Barry M. Altenberg, a psychiatrist. *Ibid.* The complaint alleged that Dr. Altenberg was negligent "in his management and care for Edith Schuster in failing to recognize or take appropriate actions in the face of her psychotic condition, including failing to seek her commitment, to modify her medication, to alert and warn the patient or her family of her condition or its dangerous implications . . .." *Id.* at 226, 424 N.W.2d at 160. The Wisconsin Supreme Court reversed, holding that the complaint stated claims under Wisconsin law for each allegation of negligence and that public policy did not bar the action. *Id.* at 262, 424 N.W.2d at 175. It cautioned, however, "that there may in this or in other cases, as developed in a full trial, nevertheless exist circumstances, such as where the injury is 'too remote' from the negligence, in which public policy mandates against the imposition of liability." *Ibid.* The court, however, apparently did not consider the "no sensible or just stopping point" prong of the public-policy analysis since that point was neither discussed in the decision nor argued in the briefs.

Unlike the situation in *Altenberg,* the facts here have been developed in a full trial. These facts raise serious questions as to how far the courts of this state should go in imposing liability for consequences that are only arguably foreseeable.

Liability was imposed on Milwaukee County because the jury found that the failure of county personnel to prevent Boles from leaving the hospital was a

825

substantial factor in her death that afternoon. Would the result have been different if Boles had been killed the next day? A month later? A year later? Even if the fatal confrontation with an automobile had been a year or more after the failure to detain Boles, it could be argued that that initial failure and the concomitant lack of appropriate treatment were substantial factors in her death. The underlying principle of the majority decision would even impose liability if hospital personnel do not forcibly detain physically ill persons who want to leave and are then injured as a result. The danger is apparent: we are entering "a field that has no sensible or just stopping point." *See Altenberg,* 144 Wis. 2d at 243, 424 N.W.2d at 167.

## B.

Whether we agree with the procrustean prerequisites to the emergency detention of persons thought to be mentally ill—and I believe they are too limiting, *see, e.g.,* Hendrickson, *They Ask Why,* The Milw. J., Jan. 29, 1989 (Wisconsin Magazine) at 5,— sec. 51.15(1), Stats., until modified or repealed, reflects the public policy of this state as codified by the legislature. Cases seeking recovery for damages resulting from an alleged negligent failure to detain will be brought where the sec. 51.15(1) prerequisites to emergency detention may, or may not, be present. Indeed, on the record before this court, these prerequisites are not present here.[3] By ruling that sec. 51.15(1), Stats. is not relevant to a determination of whether the duty of ordinary care has been fulfilled, the majority in effect holds that there are circumstances where hospital personnel must violate the law in order to be free from negligence. This is clearly against public

---

[3] *But see* footnote 2.

policy. It also places hospital personnel in a no-win situation. They must choose between the Scylla of tort liability for failure to detain and the Charybdis of tort liability for unwarranted detention. That, too, is something the law should not tolerate.