**James R. HOLCOMB and Jacquelyn Holcomb, Appellees,**

v.

**Dorothea A. HOFFSCHNEIDER, John Hoffschneider, and C. B. Property Sales, Appellants.**

No. 63753.

Supreme Court of Iowa.

Oct. 15, 1980.

James A. Pratt of Heithoff, Pratt & Heithoff, Council Bluffs, for appellant C. B. Property Sales.

James A. Pugh of Pogge, Root & Steege, Council Bluffs, for appellees.

UHLENHOPP, Justice.

This appeal involves a claim of fraudulent misrepresentations by a realtor regarding the number of acres in irregularly shaped real estate it sold, and an issue of punitive damages. A jury awarded the purchasers $6000 actual damages. The realtor appealed and the purchasers cross appealed.

The realtor contends in this appeal that the purchasers did not rely on any representations as to the size of the property and that because the purchasers knew the actual boundaries of the property they bought, they did not sustain damages.

The purchasers cross appeal from the trial court's refusal to submit their demand for punitive damages to the jury. They assert that proof of fraud alone generates a jury question on such damages.

We view the evidence in the light most favorable to the purchasers who prevailed before the jury. *Briggs Transportation Co. v. Starr Sales Co.*, 262 N.W.2d 805, 808 (Iowa 1978).

I. *Reliance.* Dorothea A. and John Hoffschneider listed their house and lots for sale with defendant C. B. Property Sales. The price was $65,000 and the size of the lots, numbers 6 and 7, was stated as 6.8 acres. Dean Olson, a salesman for C. B. Property, placed advertisements in two local newspapers on several days in May through July 1975. The ads stated the property contained six acres.

The purchasers, plaintiffs James R. and Jacquelyn Holcomb, first saw the property in July 1975. They attended an open house of the property hosted by Olson. Subsequently Olson walked the boundaries of the property with them. He also showed them the listing before they made their offer to buy, and stated at various times prior to the sale that he would guarantee the property contained at least 6.6 acres. Actually it contained 4.6 acres.

The parties dispute whether the Holcombs saw the newspaper ads before they offered to buy. Without question the Holcombs saw the listing contract prior to their offer. James R. Holcomb testified on direct examination:

Q. Was the question of acreage of property that was for sale ever brought up? A. Yes, before we made an offer to buy the property we stopped at Dean's office and he gave us like a listing agreement and it showed the amount of acres. It showed 6.8 and this was on his original copy and before he Xeroxed it he says, I don't know, Jim, I guarantee at least 6.6 acres of ground here. So I put a check by the 6.8 acres and put a question mark and wrote 6.6.

He run a Xerox copy and we took it home and that's what we made the offer to buy off of; that sheet of paper.

Q. How many times prior to the closing of the transaction—how many times did the question of acreage come up? A. Probably 10, 15 times at least.

Q. Was it brought up by you or how? A. By me because it just didn't appear to me that there was that much ground there and he says we sell 90% of the

acreages out here and Mr. Herzberg used to live in this house and there is a plat on our wall down in the office and I know that there is that much ground there. So, I took his word for it.

Q. Did he make an explanation? A. He said because it was pie shaped and that hills is deceiving because it is along from the one point to the top of the hill is a long ways. It does look, you know, the distance is deceiving of just how far it is.

Q. What was the terrain like? A. Well, the road comes around like this and it goes, the property goes down like this and goes up like this, you know, it's like that (indicating).

Q. So behind your house there is first a valley and then a hill; is that what you are saying? A. Yeah.

Holcomb reasserted on cross–examination that Olson represented the property contained 6.6 acres and that the Holcombs relied on those statements:

Q. And every time you asked Dean Olson he said about six acres. A. No, he said, I guarantee at least 6.6.

Q. And you asked him the same question 15 to 20 times and every time he said, I guarantee the size to be 6.8 acres. A. He said Mr. Herzberg lived in here. There is a plat of this on our wall. And he said, no, if there was any difference they would catch it.

Q. Why did you ask him 15 to 20 times? A. Because it didn't look like there was that much property there.

Q. Why didn't you check a little further on it? [Objection, overruled.] A. Because Dean guaranteed me there was that much ground there.

Q. Did you walk the boundaries of the land you were talking about? A. Yes.

Q. You went out and looked at it? A. Yes.

Herzberg was president of C. B. Property and also the general contractor who constructed the house in question. He lived in the house prior to its sale to Hoffschneiders.

The Holcombs eventually offered $54,000 for the house and lots, and purchased the property for that price.

As to C. B. Property's contention that the Holcombs did not rely on the misrepresentations, the evidence does show that the Holcombs examined the property. This court has said, however, that a buyer cannot generally be held to be able to judge the contents of a parcel of land by the eye. *Boddy v. Henry*, 126 Iowa 31, 42, 101 N.W. 447, 451 (1904). Even though a buyer examines land before purchasing, he may normally rely upon the representations of the seller as to measurement. *Id.* at 42, 101 N.W. at 450–51.

C. B. Property argues that if the Holcombs really wanted to know the exact acreage, they should have obtained a survey. On cross–examination Holcomb had this to say on that subject:

Q. Do you know what a survey is? A. Yes.

Q. Would you tell the jury what a survey is? A. Well, that's when you have a surveyor come out and tell you how much ground is in there.

Q. And a surveyor would also tell you how many acres you are buying. A. Correct.

Q. And you knew what a survey was at that time you were purchasing this property. A. Yes, but I didn't feel it was necessary to have it surveyed since C. B. Property was engaged in the whole transaction out there in the Rolling Hill Addition.

Q. So you didn't ask for a survey because of that, is that correct? A. Correct.

This court stated in *McGibbons v. Wilder*, 78 Iowa 531, 535, 43 N.W. 520, 522 (1889):

This court has repeatedly held, in effect, that a party may rely upon representations as to the ownership of property, its location, and the like; and that, to entitle him to recover for fraudulent representations, he is not bound to show that he instituted inquiry by consulting records or plats, or employing a surveyor, or the like.

*See Riley v. Bell,* 120 Iowa 618, 627, 95 N.W. 170, 172 (1903); *Clark v. Haggard,* 141 Conn. 668, 673, 109 A.2d 358, 361 (1954).

■ Under the testimony and these pronouncements, we hold the Holcombs generated a jury issue on reliance. The jury could say that although the Holcombs doubted the representations as to acreage were right, after Olson's repeated assurances they took his word.

■ II. *Damages.* Iowa follows the benefit–of–the–bargain rule, that is, a defrauded purchaser is entitled to the difference between the value the property would have had as represented and the value of the property he actually received. *Syester v. Banta,* 257 Iowa 613, 626, 133 N.W.2d 666, 669 (1965); *Perry Fry Co. v. Gould,* 214 Iowa 983, 988, 241 N.W. 666, 669 (1932).

■ In ascertaining the value of property, its owner is a competent witness to testify as to its market value. 31 Am. Jur.2d *Expert and Opinion Evidence* § 142 (1967). Likewise, he is competent to give his opinion on what the property would have been worth if it had been as represented. *Northrup v. Miles Homes, Inc.,* 204 N.W.2d 850, 856–57 (Iowa 1973); *see Reed v. Bunger,* 255 Iowa 322, 331, 122 N.W.2d 290, 296 (1963); *Slabaugh v. Eldon Miller, Inc.,* 244 Iowa 29, 38, 55 N.W.2d 528, 532 (1952); *Kohl v. Arp,* 236 Iowa 31, 35, 17 N.W.2d 824, 826–27 (1945). He may also state his opinion on the difference between the two values. *See Christy v. Heil,* 255 Iowa 602, 612, 123 N.W.2d 408, 414 (1963) (analogous situation of difference in value of property with or without a good well).

Furthermore, in this case the individual who developed the property testified that unimproved lot 8, which adjoined the property purchased by the Holcombs, consisted of 2.2 acres and sold in 1978 for $6000—the amount Holcombs asked in this action and the jury awarded. Holcombs originally brought suit in equity to obtain lot 8, claiming it was a missing parcel in their purchase. Their deed did not cover lot 8, and they recast their petition and asked for $6000 damages.

■ The gist of C. B. Property's argument on damages is that the Holcombs saw the property they bought, from visual inspection they knew its actual size, and they bid and bought that exact tract for $54,000—they were willing to pay that amount for what they saw. C. B. Property urges that the Holcombs got what they paid for and they therefore sustained no damage.

Involved in an issue of this kind are two kinds of cases: those in which a purchaser intends to purchase a tract, not a quantity in acres or by dimensions, *Hardin v. Hill,* 149 Mont. 68, 74, 423 P.2d 309, 312 (1967); *Briley v. Hay,* 13 S.W.2d 997, 999 (Tex.Civ. App.1929), as distinguished from those in which the purchaser intends to purchase a number of acres or by dimensions. In the latter situation the purchaser is damaged if the seller fraudulently misrepresents the acreage or dimensions. *Miller v. Conn,* 193 Iowa 458, 461, 186 N.W. 902, 903 (1922); *Boddy v. Henry,* 126 Iowa 31, 44, 101 N.W. 447, 452 (1904). The jury could reasonably find on the evidence that this case was of the latter sort. C. B. Property makes a cogent jury argument that the case was of the former kind, but the decision was ultimately for the jury. We do not find merit in this claim of error.

III. *Exemplary damages.* Holcombs cross appeal from the trial court's failure to submit the issue of exemplary damages to the jury. The court sustained C. B. Property's motion to withdraw this issue from the jury.

We have two questions here. Are exemplary damages recoverable for fraud? Is the evidence sufficient here to permit an award of exemplary damages?

A. Fraud is one of the recognized grounds for exemplary damages, and most *general* statements of the bases for such damages include fraud. *Grefe v. Ross,* 231 N.W.2d 863, 868 (Iowa 1975); *Northrup v. Miles Homes, Inc.,* 204 N.W.2d 850, 859 (Iowa 1973); *Charles v. Epperson & Co.,* 258 Iowa 409, 431, 137 N.W.2d 605, 618 (1965); *Smith v. Peterson,* 282 N.W.2d 761, 767 (Iowa App.1979); *Bankers Life & Casualty*

*Co. v. Kirtley,* 307 F.2d 418, 422–23 (8th Cir. 1962); *Amos v. Prom, Inc.,* 115 F.Supp. 127, 133–34 (N.D.Iowa 1953); *see also Stockdale v. Agrico Chemical Co.,* 340 F.Supp. 244, 261–62 (N.D.Iowa 1972).

But the *specifics* of the cases demonstrate that not every fraud case permits an exemplary damage award; circumstances of aggravation are present in the fraud cases allowing such damages. An illustrative case is *Syester v. Banta,* 257 Iowa 613, 133 N.W.2d 666 (1965). There the plaintiff was a widow in her late sixties working as a coffee girl in a cafeteria. Through the fraud of the defendants' representatives, the plaintiff was induced to purchase eighteen dance courses amounting to 4057 hours and costing $29,174.30. The defendants' rules for its representatives instructed them to try to keep customers from consulting a banker, lawyer, wife, or friend or from thinking the matter over, to tell them they were graded excellent in rhythm, natural ability, and animation, and to appeal to emotions. The rules contained other strategy. The defendants' fraud, greed, and avariciousness persuaded this court that exemplary damages could be allowed. A similar illustration is *Charles v. Epperson & Co.,* 258 Iowa 409, 137 N.W.2d 605 (1965). There Epperson stood in a fiduciary relationship involving the trust and confidence of his fellow directors of a closely held corporation. He conducted the inner operations of the company, took advantage of his colleagues' trust, and misappropriated assets to his own benefit. The case involved fraudulent conduct plus a fiduciary relationship.

Thus the statements on exemplary damages in the fraud field are to the effect that "ordinary" or "simple" fraud alone is not enough for exemplary damages; additional circumstances of aggravation are essential. As stated in 37 Am.Jur.2d *Fraud and Deceit* § 347, at 466 (1968):

Generally speaking, a recovery of exemplary or punitive damages in an action based on a fraudulent sale will be allowed only where the fraud is an aggravated one, as where it is malicious, deliberate, gross, or wanton.

As similarly stated in 37 C.J.S. *Fraud* § 144, at 489 (1943):

In ordinary cases a recovery of exemplary, punitive, or vindictive damages will not be allowed in an action of deceit, but in certain cases such damages may be allowed, as where the wrong involves some violation of duty springing from a relation of trust or confidence, or where the fraud is gross or the case presents other extraordinary or exceptional circumstances clearly indicating malice and willfulness, as where it appears that defendant acted with a deliberate intent to injure plaintiff. The rule allowing exemplary damages has been extended to include a case where there was no actual fraudulent intent, but where there was such a reckless disregard of the truth as to justify the legal inference of a fraudulent intent.

The statement we have quoted from American Jurisprudence is also found in *Annot.,* 165 A.L.R. 614, 615 (1946). Also, citing three jurisdictions, the annotator states on page 619:

According to the language used in some cases, mere unaggravated fraud seems to constitute a sufficient basis for the award of punitive damages. It should be noted, however, that none of the cases contains the positive statement that simple fraud in a sale warrants the award of punitive or exemplary damages, but that the cases merely do not stress the necessity of the presence of some aggravation. Hence, if these cases can be considered to support the view that punitive damages are permissible in case of simple fraud, they are, for this reason, but very weak authority for this proposition.

The American Law Institute has adopted a section basing exemplary damages in tort on "outrageous" conduct. Restatement (Second) of Torts § 908 (1979). Paragraph 2 of the section states:

Punitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless

indifference to the rights of others. In assessing punitive damages, the trier of fact can properly consider the character of the defendant's act, the nature and extent of the harm to the plaintiff that the defendant caused or intended to cause and the wealth of the defendant.

Regarding outrageousness, the Institute states in Comment *b:*

> Since the purpose of punitive damages is not compensation of the plaintiff but punishment of the defendant and deterrence, these damages can be awarded only for conduct for which this remedy is appropriate—which is to say, conduct involving some element of outrage similar to that usually found in crime. The conduct must be outrageous, either because the defendant's acts are done with an evil motive or because they are done with reckless indifference to the rights of others. . . . Reckless indifference to the rights of others and conscious action in deliberate disregard of them . . . may provide the necessary state of mind to justify punitive damages.

Regarding exemplary damages generally, the Institute states in Comment *f:*

> The entire concept of punitive damages has been subjected to attack from some sources. Some states decline to award these damages in the absence of a statutory provision. Others insist that there must be significant compensatory damages in order to warrant their award and still others hold that they must be proportioned to compensatory damages in some appropriate ratio. In many states there has been a tightening of control by the appellate courts over discretion of the trier of fact.
>
> Restrictive rules of substantive law have also developed in some states. Thus punitive damages are sometimes disallowed unless the defendant's conduct was "aimed at the public generally," and certain types of defendants, such as a governmental unit, may not be subject to them. Sometimes they are limited to the amount of counsel fees. Sometimes procedural techniques are utilized to prevent

abuse of a claim for punitive damages when it becomes apparent that they are not warranted and the claim was made for the purpose of introducing prejudicial evidence that would otherwise not be admissible.

■ B. Since we cannot at this time conceive of all the fraudulent practices which may be committed hereafter, we cannot now formulate a detailed rule on exemplary damages to cover all fraud cases. We confine ourselves to this case. The Holcombs made a case for the jury on fraud. They are entitled to their compensatory damages. But their case at best is of the "ordinary" or "simple" fraud variety, unaggravated by circumstances warranting punitive damages. The trial court properly withdrew Holcomb's punitive damage claim from jury consideration.

We find no error in the appeal or cross appeal.

AFFIRMED.

All Justices concur except LARSON, J., who takes no part.