# IN THE COURT OF APPEALS OF IOWA

No. 23-1237
Filed January 9, 2025

**AMERICAN WAGYU BREEDERS, LLC,**
    Plaintiff-Appellee,

**vs.**

**SARAH BAILEY and ESTATE OF ERIC C. BAILEY,**
    Defendants-Appellants.
_____

Appeal from the Iowa District Court for Johnson County, Paul D. Miller, Judge.

The defendants appeal the district court's entry of judgment following a jury trial in which the defendants were found liable for breach of contract and fraudulent misrepresentation and assessed damages. **AFFIRMED.**

Siobhan Briley of Pugh Hagan Prahm PLC, Coralville, for appellants.

Jason J. O'Rourke and Jenny L. Juehring of Lane & Waterman LLP, Davenport, for appellee.

Heard by Tabor, C.J., and Ahlers and Sandy, JJ.

**SANDY, Judge.**

Where's the beef? That is the pivotal question brought before us in this case. Despite days of trial and years of litigation, we are left just as confused now as the day the original petition was filed. We only know that a full-blood black Wagyu bull named Michiyoshi disappeared into thin air. Sarah Bailey and the estate of Eric Bailey (together, the "Baileys") appeal the district court's entry of judgment following a jury trial in which they were found liable for breach of contract and fraudulent misrepresentation and assessed damages. The jury found the Baileys breached a livestock agreement with American Wagyu Breeders, LLC (AWB) under which they were to care for Michiyoshi. The jury also found the Baileys made fraudulent misrepresentations to AWB concerning Michiyoshi, and it awarded AWB damages of $460,000.

The Baileys argue the district court (1) abused its discretion in excluding the proposed Exhibit L, (2) abused its discretion in excluding testimony relating to Sarah's character for truthfulness, (3) abused its discretion in accepting the jury's award of speculative and excessive damages, and (4) committed a combination of errors that cumulatively denied the Baileys a fair trial. AWB requests appellate attorney fees pursuant to its livestock agreement with the Baileys. Finding no abuses of discretion, we affirm the district court. We also award AWB its appellate attorneys' fees.

## I. Background Facts and Proceedings

In November 2012, AWB and the Baileys entered an agreement under which the Baileys would board and be allowed to use Michiyoshi. This dispute arose following a breeder's discovery in 2016 that a bull the Baileys provided for

collection was not Michiyoshi as claimed by the Baileys but, in fact, a different black Wagyu bull they owned named Hirashige. To this date, Michiyoshi's fate is unknown. The Baileys claimed they had only one other bull at their West Branch farm around the time they boarded Michiyoshi. That animal was Hirashige, also known as Romeo, but the Baileys claimed to have sold him to a friend shortly before or shortly after Michiyoshi arrived at their farm. According to that timeline, Michiyoshi would have been the only bull on the Baileys' farm by December 2012.

In April or May 2014, the Baileys sent a bull that was meant to be Michiyoshi to Hawkeye Breeders Service, Inc. (Hawkeye Breeders) in Adel to have semen collected. The bull the Baileys sent to Hawkeye Breeders was returned to the Bailey farm in September 2014. In 2015, the Baileys sent the same bull to a farm in Oklahoma for boarding. In 2016, the same bull was again sent to Hawkeye Breeders to have semen collected. While the bull was there, DNA testing was conducted and it was determined that the bull the Baileys sent to Hawkeye Breeders in 2014 and to Oklahoma in 2015 was actually Hirashige, who the Baileys claimed had died long before. At the time of trial it remained unclear what happened to Michiyoshi.

Michiyoshi had been developed and owned by AWB, whose sole member was Nick Bell. Bell had worked with a well-known Wagyu breeder to develop the embryo that eventually became Michiyoshi. He claimed that Michiyoshi's rare genetics produced offspring with high-quality meat. Michiyoshi was registered with the American Wagyu Association as a 100% full blood Wagyu bull. When a full-blood Wagyu bull is registered with the AWA, the owner is required to submit a blood or hair sample so that the AWA can confirm the DNA and keep the DNA on

file, which Nick did when he registered Michiyoshi. In 2012, Bell sought to have Michiyoshi boarded and cared for, which led to his relationship with the Baileys.

The Baileys lived on a farm near West Branch and had farmed and raised cattle for many years. They raised Wagyu cattle and owned the business Bailey American Wagyu. Sarah testified that they began purchasing Michiyoshi's semen in 2011 because it would produce good meat for the Baileys to sell. The Baileys also used semen from Hirashige, whom they bought from another bull owner, Mike Goodell, in January 2012. Before being sold, Goodell registered Hirashige with AWA. The AWA kept Hirashige's DNA on file and tattooed his AWA registration number in his ear. The Baileys began boarding Hirashige in fall 2011—shortly before purchasing him. Eric regularly worked with Hirashige, knew what he looked like, and trained him for livestock shows. The Baileys claimed that Hirashige was the only bull kept on their farm in 2011.

In July 2012, Sarah visited Bell's farm in Michigan with her son to see Michiyoshi because the Baileys were interested in boarding the bull in exchange for rights to use his semen on their herd. Michiyoshi was the only animal on Bell's farm. Following that visit, the Baileys continued to reach out to Bell about boarding Michiyoshi. In November they exchanged a draft livestock agreement over email.

Later that month the Baileys agreed to board Michiyoshi and drove to Bell's farm to pick him up on November 25. They signed the livestock agreement upon arriving and transported Michiyoshi back to their farm the following morning. Bell provided the Baileys with a certificate of veterinary inspection for Michiyoshi, which is required when a bull is transported between states. Two days after Michiyoshi arrived at the Bailey farm, Sarah emailed Bell photos of Michiyoshi at the farm

which showed him with two ear tags that Bell testified had been in Michiyoshi's ears at the time of the Bailey pickup. The Baileys testified they left the tags in until Hawkeye Breeders removed them in May 2014.

Conflicting evidence was presented as to what animals were present on the Bailey farm when Michiyoshi arrived. Eric testified that Hirashige had been sold to cattle farmer Molly Erenberger and left before Michiyoshi arrived on November 26. Yet Sarah testified that Hirashige was on their farm when they first brought Michiyoshi and that the bulls were kept in different pens. At trial, she claimed that she sold Hirashige to Erenberger and hauled the bull to Erenberger's farm shortly after Michiyoshi arrived on November 26. She could not recall the specific date of Hirashige's sale to Erenberger.

When the dispute over the bull's identity first arose, Sarah told Bell's wife that Hirashige left the Bailey farm within a week of Michiyoshi's arrival. But in interrogatories she claimed to have sold Hirashige in "2013 or 2014." Sarah and Eric both claimed Hirashige was no longer in their possession after being sold. Ronald Woosley, who ran the Oklahoma cattle boarding facility, testified that in 2013 he saw "three or four" bulls on the Bailey farm and in the same pen. Erenberger testified that the bull the Baileys sold her got sick, died, and was buried on her property about a month after arriving at her property. This bull's remains were later exhumed for DNA testing, but the remains were too decomposed to provide useful material.

The Baileys claimed that Hirashige died at some point after he was sold, although their positions on when he died have changed. Sarah first claimed while texting Bell's wife in 2016 that Hirashige died in fall 2013. A few days later she

told Bell's wife that Hirashige died in "the very first part of 2013," and then "the first week of January 2013." In interrogatories she claimed he died "on or about January 2014 or 2015." At trial she first stated he died in January 2014, but then stated she was not sure when he died.

Regardless of the claimed date of death, Sarah testified that she signed a certificate of veterinarian inspection on January 14, 2013, in anticipation of a livestock show in Colorado. That date is after Hirashige's purported sale to Erenberger and after several of Hirashige's alleged dates of death. Sarah admitted that this evidence meant the date of death would have been sometime after the 2013 livestock show in Colorado.

Sarah sent Bell numerous email updates relating to Michiyoshi during 2013, but sent no pictures until August. The pictures she sent in August contained a bull with no ear tags, despite the Baileys claiming Michiyoshi's ear tags had been left in until Hawkeye Breeders removed them in 2014. According to Sarah, Michiyoshi had never left the farm at the time of those photos. Sarah sent emails informing Bell of Michiyoshi's condition into 2014.

Nick requested that the Baileys send Michiyoshi to Hawkeye Breeders for semen collection in April 2014. Sarah scheduled the appointment and Hawkeye Breeders arrived at their farm with a trailer and loaded a bull purported to be Michiyoshi. Hawkeye Breeders inspected that bull on May 6 and found a metal USDA tag in its right ear indicating the tag had been inserted while the animal was in Kentucky. It was not removed as Hawkeye Breeders' owner, David Jungmann-Jensen, testified that doing so would be illegal. The bull was, however, tagged

with a Hawkeye Breeders identifying tag. The animal was at Hawkeye Breeders until semen collection was completed in September 2014.

Sarah claimed that, when the bull returned, his original plastic ear tags had been removed by Hawkeye Breeders and new tags were put in his ear. But Jungmann-Jensen testified no plastic tags had been found in its ears, and no plastic tags were remarked upon in the intake form. It would later be determined that this bull was Hirashige. Upon Hirashige's return to the Bailey farm and throughout 2014 and 2015, Sarah emailed Bell updates on the bull, representing it to be Michiyoshi.

Bell contacted the Baileys in May 2015 to notify them he was terminating the livestock agreement and requested arrangements for the inspections required to transport Michiyoshi to Oklahoma for boarding. During that inspection, Sarah represented to the veterinarian Dr. Alan Beyer that the bull to be transported to Oklahoma was Michiyoshi. The bull was to be loaded for transport on June 19.

Bell traveled from Michigan to Iowa a few days ahead of time to obtain some semen inventory he had sent the Baileys. The Baileys refused to meet with him at their farm despite Bell having "driven all this way." Bell testified the Baileys would only meet with him for about an hour the night before transport and refused to hand over the semen inventory. Bell also testified he only saw the bull as close as fifty yards away. Sarah took a video of the bull that day which shows a metal USDA ear tag in its ear. The Baileys admitted they have never seen Michiyoshi with a metal USDA ear tag. Such a tag could not have been inserted into Michiyoshi's ear because only veterinarians can insert them and Michiyoshi had not been seen

by a veterinarian while in their possession. The bull was loaded into the trailer for transport at 4:30 AM the next morning.

The bull remained at Woosley's farm in Oklahoma until June 2016 when he was sent to Hawkeye Breeders for semen collection. The bull that returned to Hawkeye Breeders had the same ear tag as the bull that had previously been at Hawkeye Breeders and that was returned to the Bailey farm in September 2014.

In September, someone who had purchased Michiyoshi's semen contacted Hawkeye Breeders to inform them that, according to DNA tests, the calves produced from that semen were not Michiyoshi's offspring. Hawkeye Breeders contacted Bell to inform him of this concern. Bell had already sold significant amounts of the semen collected from that bull. Hawkeye Breeders sent Bell a photograph of the bull's ear, which Bell recognized to not belong to Michiyoshi. Hawkeye Breeders tested the DNA of the bull purported to be Michiyoshi, and that testing confirmed that the bull was Hirashige. It is still unclear how the supposedly dead Hirashige was represented to be Michiyoshi for several years, and there is no trace of Michiyoshi.

AWB brought its civil action asserting three causes of action—negligence, fraudulent misrepresentation, and breach of contract—in September 2019, and a six-day jury trial was held in March to April 2023. The jury found the Baileys breached the livestock agreement with AWB and made fraudulent misrepresentations to AWB concerning Michiyoshi. It awarded AWB damages of $460,000. The Baileys moved for a new trial, which the district court denied. The Baileys now appeal.

## II.  Standard of Review

Evidentiary rulings are discretionary and therefore reviewed for abuse of discretion.  *Pexa v. Auto Owners Ins. Co.,* 686 N.W.2d 150, 158–59 (Iowa 2004).  Rulings on motions for new trial based on the jury's award of excessive damages are also reviewed for abuse of discretion.  *Fry v. Blauvelt*, 818 N.W.2d 123, 128 (Iowa 2012).  A court abuses its discretion if its decision was "based on a ground or reason that is clearly untenable or when the court's discretion [was] exercised to a clearly unreasonable degree."  *Pexa*, 686 N.W.2d at 160.

If a court abuses its discretion, "[r]eversal is called for . . . only if it appears that prejudice has resulted."  *Strain v. Heinssen,* 434 N.W.2d 640, 641–42 (Iowa 1989).  Evidentiary rulings are prejudicial only if "it is probable a different result would have been reached but for the admission of the evidence or testimony."  *Mohammed v. Otoadese,* 738 N.W.2d 628, 633 (Iowa 2007) (cleaned up).

## III.  Discussion

### A.  Exclusion of Proposed Exhibit

The Baileys argue the district court abused its discretion in excluding the Baileys' proposed Exhibit L.  "The district court has inherent power to maintain and regulate cases proceeding to final disposition within its jurisdiction."  *Lawson v. Kurtzhals*, 792 N.W.2d 251, 258 (Iowa 2010) (cleaned up).  "This power includes the authority to exclude evidence for failure to supplement discovery."  *Id.*  The district court should consider whether "(1) the party's reasons for not providing the challenged evidence during discovery; (2) the importance of the evidence; (3) the time needed for the other side to prepare to meet the evidence; and (4) the propriety of granting a continuance."  *Id.* at 259.

On March 2, 2023, the district court entered its final pretrial report and order. That order required the parties to file their exhibit lists and serve a copy on counsel before trial, and specifically provided that "[a]ny exhibit not identified will not be admitted at trial unless this order is modified by the court, for good cause shown, by any party wishing to offer such exhibit."

The Baileys filed their joint exhibit list on March 20, which did not include Exhibit L. They filed their first amended joint exhibit list on March 22, which also did not include Exhibit L. On Thursday, March 30, 2023—the third day of trial— the Baileys filed their second amended joint exhibit list, which also did not include Exhibit L. This proposed exhibit is not available in the record. We cannot surmise the reason, but Exhibit L was never e-filed and the district court clerk never had possession of the exhibit. The better practice would have been for counsel to provide the district court clerk with any rejected proposed exhibit—especially when not e-filed—so that the exhibit may be retained in the case file for our review. *See In re F.W.S.*, 698 N.W.2d 134, 135–36 (Iowa 2005) (finding review of an unreported proceeding was improvident where the appellant failed to file an approved statement of evidence pursuant to Iowa Rule of Appellate Procedure 6.806). The clerk is unable to transmit or upload an exhibit which they do not possess. Entering rejected exhibits into the record allows appellate courts to more thoroughly review that record. An offer of proof, when describing a document, only goes so far.[1]

---

[1] Even without the benefit of Exhibit L in the record, we address the arguments related thereto with the understanding that the exhibit is what the Baileys purport it to be.

Despite Jungmann-Jensen having testified on Thursday, March 30, Sarah's attorney advised the court on Monday, April 3, that she wished to call Jungmann-Jensen to testify again concerning the Baileys' newly proposed Exhibit L. The proposed Exhibit L consisted of inventory cards from Hawkeye Breeders' inventory records. Those records had never been previously marked or disclosed by the Baileys as a potential exhibit on their exhibit list and Sarah's counsel did not question Jungmann-Jensen about those records during cross-examination on March 30.

AWB objected to recalling Jungmann-Jensen to testify about Exhibit L, arguing the Baileys had the opportunity to examine Jungmann-Jensen the week before and should not get another bite at the apple simply because they were not prepared to question him. AWB also objected because Exhibit L was never previously disclosed or marked as an exhibit, in violation of the district court's pre-trial orders.

The district court ordered that the Baileys conduct an offer of proof and examine Jungmann-Jensen concerning Exhibit L outside the presence of the jury. Sarah's counsel elicited from Jungmann-Jensen that Exhibit L was a collection of Hawkeye Breeders' inventory cards for Michiyoshi that tracked semen collection and storage. Exhibit L indicated that Michiyoshi's semen was collected and frozen on April 21, 2016, and received by Hawkeye Breeders on March 14, 2016. Mr. Jungmann-Jensen testified that the dates on the inventory card must be incorrect—Hawkeye Breeders could not have received Michiyoshi's semen a month before it was collected and frozen.

Here, we find the Baileys' reasons for not providing the challenged evidence earlier and the irrelevant nature of the evidence heavily outweighed any interest in its admission.

First, the Baileys do not argue that the evidence was unavailable or unknown to them at the times they filed each of their exhibit lists. In fact, the Baileys concede the opposite by attempting to argue that introduction of Exhibit L was not "trial by ambush." But if this evidence was available to them during discovery, there was no reason they could not disclose and list the document as a proposed exhibit in anticipation of Jungmann-Jensen's testimony.

The Baileys' previous attorney made the decision to not include Exhibit L and adding a new attorney should not be used as a way to take a new bite at the apple. And the Baileys' own contention that their attorney "was required to review and understand thousands of pages of documents about a technical subject" seems to be a tacit admission that they were unprepared.

Next, it is unclear what purpose Exhibit L's introduction was meant to serve. At worst, it shows that Hawkeye Breeders had some inaccurate records. It in no way refutes the evidence that the Baileys previously sent Hirashige to Hawkeye Breeders and Oklahoma while representing the bull was Michiyoshi. And the Baileys do not elaborate on what factual theory Exhibit L is meant to buttress beyond that it could show that Bell was keeping Michiyoshi in another undisclosed location where he had his semen collected. But this inventory card does not support that theory because, no matter where or when the semen was collected, it could not be frozen before it was collected. Exhibit L could easily confuse a juror

because it does not relate to the theory for which it is being offered to support. The district court did not abuse its discretion in refusing to admit Exhibit L.

### B. Exclusion of Testimony

The Baileys contend it was an abuse of discretion by the district court to exclude testimony of Dr. Beyer as it related to Sarah's character for truthfulness. "It is well-settled law in Iowa that a bright-line rule prohibits the questioning of a witness on whether another witness is telling the truth. There are no exceptions to this rule." *Bowman v. State,* 710 N.W.2d 200, 204 (Iowa 2006) (internal citation omitted). Iowa Rule of Evidence 5.608(a) states that "[a] witness's credibility may be attacked or supported by testimony about the witness's reputation for having a character for truthfulness or untruthfulness . . . . But evidence of truthful character is admissible only after the witness's *character* for truthfulness has been attacked." (Emphasis added).

Dr. Beyer is a retired veterinarian and Sarah's friend. Dr. Beyer conducted the inspection of the bull following Bell's termination of the livestock agreement. While testifying, Sarah's attorney asked Dr. Beyer if he thought Sarah was honest and whether Sarah ever lied to him. AWB objected to the questioning, and those objections were sustained.

The Baileys argue that Dr. Beyer should have been permitted to answer the questions relating to Sarah's character for truthfulness because the entire case was based on her character for truthfulness. But as the district court stated, prior to Dr. Beyer's testimony, "AWB did not attack Sarah's character for truthfulness or untruthfulness but rather her specific representations made concerning the well-being and status of Michiyoshi."

We find no abuse of discretion in the district court's exclusion of Dr. Beyer's testimony relating to Sarah's character for truthfulness.

## C. Award of Damages

The Baileys argue the jury's award of $460,000 in total damages was speculative and excessive. AWB requested $760,000 in total damages—$60,000 for Michiyoshi's fair market value and $700,000 for lost profits from the sale of his semen.

As the party seeking damages, AWB bears the burden of proving such damages exist. "[I]f the record is uncertain and speculative as to whether [AWB] has sustained damages, the factfinder must deny recovery." *St. Malachy Roman Cath. Congregation of Geneseo v. Ingram,* 841 N.W.2d 338, 352 (Iowa 2013) (quoting *Data Docs., Inc. v. Pottawattamie Cnty.*, 604 N.W.2d 611, 616 (Iowa 2000)). Yet "[t]here is a distinction between proof of the fact that damages have been sustained and proof of the amount of those damages." *Id.* (quoting *Pavone v. Kirke*, 801 N.W.2d 477, 495 (Iowa 2011)). "[I]f the uncertainty merely lies in the amount of damages sustained," AWB may be awarded damages "if there is proof of a reasonable basis from which the amount can be inferred or approximated." *Id.* (citation omitted).

Accordingly, "'some speculation on the *amount* of damages sustained is acceptable,' but [AWB] cannot recover overly speculative damages." *Id.* (emphasis added) (citation omitted). "[W]hile a loss may be hard to ascertain 'with preciseness and certainty, the wronged party should not be penalized because of that difficulty.'" *Hammes v. JCLB Properties, LLC*, 764 N.W.2d 552, 558 (Iowa Ct. App. 2008) (quoting *Olson v. Nieman's, Ltd.,* 579 N.W.2d 299, 309 (Iowa 1998)).

And "if an expert makes some flawed assumptions in testifying, that fact goes to the weight to be given the opinion, not to its admissibility." *Olson*, 579 N.W.2d at 309. "In ascertaining the value of property," the property owner "is a competent witness to testify as to its market value." *Holcomb v. Hoffschneider,* 297 N.W.2d 210, 213 (Iowa 1980).

The Baileys first contend that "AWB presented no evidence of Michiyoshi's market value," which makes any award for his value speculative. But Bell did testify to Michiyoshi's market value. As the owner of Michiyoshi, Bell was qualified to testify to the bull's value. And at trial he was asked, "What do you believe, as the owner of [AWB], that the value of Michiyoshi was?" Bell responded that "[b]ecause of his unique genetics, I would not have sold [Michiyoshi] for less than [$]60,000. I'm not sure I would have even sold him for sixty, but I would have had to consider it. . . . And it probably would depend, also, if I sold him at sixty and how many units of his semen that I might still have."

The Baileys attempt to split hairs by arguing that Bell only testified about what price he would have accepted for Michiyoshi, not as to what Michiyoshi's market value was. But based on Bell's testimony, it is easy to discern that he was basing the $60,000 estimate on his estimate of Michiyoshi's market value. When Bell stated that the price he would sell Michiyoshi for would depend on how many units of semen he possessed, he was clearly making a price judgment based on the market value of Michiyoshi's semen. Michiyoshi was only as valuable as the quantity and quality of semen the bull might provide Bell or a prospective buyer.

The Baileys also highlight the testimony of Michael Goodell, who stated that in 2016 he sold a bull created from Michiyoshi's semen for $17,500. But the

Baileys admitted that Goodell stated his "opinion in terms of value is irrelevant" and that he acknowledged that Bell had the ability to establish a number for fair market value. The jury was free to consider those statements and subsequently chose to rely on Bell's value assessment.

AWB also presented evidence that its losses due to the Baileys' breach of contract and fraud were $700,000. Bell testified that he wanted 5000 units of semen collected from Michiyoshi in 2014 and 5000 units in 2016. During these collection periods, Michiyoshi would have been eight and ten years old, respectively. Jungmann-Jensen testified that 5000 units were collected from Hirashige instead of Michiyoshi in 2014, and that this was an average collection amount. Jungmann-Jensen also testified that collection for bulls typically ends around eleven years, but that collection could continue until as late as seventeen years. AWB characterized its damages calculation as a "conservative estimate" since it only calculated damages through Michiyoshi's age ten collection period. The Baileys contend that those estimates are not realistic because Exhibit G shows that barely 3000 units were collected during 2010 and 2011. But Exhibit G only covers a nine-month period of collection, and the jury granted an award of damages significantly lower than what AWB requested.

Bell also testified that each unit of semen could be sold for between $75 and $125, with a cost of less than five dollars per unit. AWB's $700,000 assumes a profit of seventy dollars per unit—at the lowest end of AWB's estimated profit range. The Baileys contend that the past net profit per unit of $49.77 would have been a more reliable estimate of lost profit. AWB points to the bull carcass results published in 2014 showing Michiyoshi to have a high yield of total meat. AWB

argues that these results would have had a substantial impact on Michiyoshi's per unit profit. And the increased demand from these results would have increased demand for Michiyoshi's semen, causing Bell to request an increased volume of samples from the breeder.

AWB provided a reasonable basis and preciseness for the figures it furnished. Even so, the jury did not adopt AWB's estimated damages wholesale. It arrived at $300,000 less in total damages than AWB estimated, which we find to be reasonable. The damages the jury awarded can reconcile an increased demand for Michiyoshi's semen while also weighing his past production. We find no error in the district court's acceptance of the jury's award of damages.

### D. Cumulative Effect of Errors

The Baileys contend that the district court's "numerous exclusions of the Baileys' evidence during trial without just or reasonable cause . . ." amounted to cumulative reversible error. Because we found the district court did not abuse its discretion in the other rulings that the Baileys challenge on appeal, we likewise cannot find that the cumulative effect of those pre-jury-verdict rulings deprived the Baileys of a fair trial.

### E. AWB's Appellate Attorney Fees

AWB requests an award of its reasonable attorneys' fees under the livestock agreement. The district court found that "[AWB] is entitled to this court determining a reasonable attorney fee and recoverable costs under the breach of livestock agreement." The Baileys did not appeal this finding, and AWB has prevailed on all issues raised on appeal. We are thus obligated to award reasonable fees to AWB. We have carefully reviewed AWB's affidavit of attorney

fees and all attached invoices and find all the requested fees to be reasonable, appropriate, and necessary to this appeal. We award AWB attorneys' fees in the amount of $23,057.50.

## IV. Conclusion

Finding no abuses of discretion, we affirm the district court. We also award AWB its appellate attorneys' fees.

**AFFIRMED.**